UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Grand Jury N-16-1

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 3:17CR 47-SRU |
| v. | VIOLATIONS: |
| THOMAS J. CONNERTON and JEAN S. ERICKSON | 15 U.S.C. § 78j(b) and 78ff (Securities Fraud) |
| | 18 U.S.C. § 1341 (Mail Fraud) |
| | 18 U.S.C. § 1343 (Wire Fraud) |
| | 18 U.S.C. § 1957 (Money Laundering) |
| | 18 U.S.C. § 1956(h) (Money Laundering conspiracy) |
| | 18 U.S.C. § 1001 (Making a False Statement) |
| | 18 U.S.C. § 2 (Aiding and Abetting) |
| | 18 U.S.C. § 981(a)(1)(C) (Forfeiture) |
| | 28 U.S.C. § 2461(c) (Forfeiture) |

<u>INDICTMENT</u>

The Grand Jury charges:

<u>COUNTS ONE THROUGH TWELVE</u>
(Wire Fraud)

At all times relevant to this Indictment:

<u>The Defendants</u>

1.      Defendant THOMAS J. CONNERTON ("CONNERTON") was a resident of Connecticut.

2.      Defendant JEAN S. ERICKSON ("ERICKSON") was a resident of Connecticut, and in March of 2016 became engaged to CONNERTON.

3.      CONNERTON was the founder, president, and CEO of Safety Technologies, LLC ("Safety Tech"), a Connecticut limited liability company that had its principal place of business in various Connecticut municipalities, including Simsbury, Madison, Westport, and Stamford.

4.      CONNERTON operated and controlled bank accounts in his own name and in the

1

name of the Safety Tech, at financial institutions that were insured by the Federal Deposit Insurance Corporation ("FDIC") and that engaged in, and the activities of which affected, interstate and foreign commerce, including, *inter alia*, Bank of America and People's United Bank.

5.    ERICKSON operated and controlled bank accounts in her own name and in the name of a family member at financial institutions that were insured by the FDIC and that engaged in, and the activities of which affected, interstate and foreign commerce, including, *inter alia*, First Niagara Bank (now known as KeyBank), and JPMorgan Chase Bank.

<u>Safety Tech and the Safety Tech Securities</u>

6.    Safety Tech was founded in 2006, purportedly for the purpose of developing and commercializing what was represented to be a highly durable puncture and cut resistant material that was to be used in the surgical glove market and other related markets.  Safety Tech's purported business of developing a more puncture resistant and cut resistant material was the only line of business that Safety Tech was represented as undertaking.

7.    CONNERTON did not obtain any patents from the United States Patent and Trademark Office.  CONNERTON applied for one patent in his own name that was initially rejected on December 19, 2013 and that was finally rejected on June 26, 2014.  This application is considered to be in an abandoned status.  CONNERTON applied for a different patent that was submitted on July 16, 2015 and, as of the date of this Indictment, has yet to be reviewed by an examiner.

8.    Safety Tech has not obtained any patents from the United States Patent and Trademark Office.  Safety Tech did not obtain or hold any licenses on any materials, products, or intellectual property, and Safety Tech did not sell and has not sold any materials, products, or intellectual property.

9.    Under the federal securities laws, securities offered for sale to the public ordinarily

must be registered with the United States Securities and Exchange Commission ("SEC" or "Commission"). The federal securities laws impose requirements that potential investors have full information upon which to base their investment decisions. CONNERTON did not register Safety Tech's securities with the SEC.

10. On December 22, 2006, CONNERTON filed Form D with the SEC as beneficial owner and partner and signed the Form D as Manager of Safety Tech. CONNERTON filed an additional Form D on July 20, 2009 and a third Form D on June 27, 2011. By virtue of the filings, CONNERTON and Safety Tech provided notice to the SEC of their intention to engage in the sale of securities pursuant to Regulation D, as an exempt offering of securities.

11. CONNERTON offered his investors small amounts of equity in Safety Tech through "Subscription Agreements" or investments contracts through which he sold what he described as "Units." According to CONNERTON, the "Units" represented a fractional equity ownership interest in Safety Tech. The Safety Tech investment contracts as sold by CONNERTON constitute "securities" within the meaning of the federal securities laws, regardless of the fact that they were not registered with the SEC (referred to herein as "Safety Tech Securities.")

The Victim-Investors

12. As described in more detail below, CONNERTON, induced numerous victim-investors to provide him funds and to purchase the Safety Tech Securities based on materially false and fraudulent pretenses, representations, and promises, by, among other ways, falsely representing that: (i) the valuation of Safety Tech and its technology was realistically in the tens and even hundreds of millions of dollars; (ii) that a lucrative deal to sell or license the technology was imminent and described it as only weeks away; and (iii) that he would use their funds for research and development, product testing, and to bring the product to market, more specifically

3

described as create a "landing strip" for the venture.

13.     Certain victim-investors who provided CONNERTON funds based on the materially false representations and promises are referred to in this Indictment by their initials as follows: M.C., C.H., T.H., H.B.H., J.S.H., S.M., L.M., G.N., J.P., M.R., L.R., S.A.S., and K.W.

### The Scheme to Defraud

14.     Beginning from in or about approximately June 2009 and continuing until the date of this Indictment, in the District of Connecticut and elsewhere, CONNERTON knowingly, willfully, and with intent to defraud, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals and sounds.

### The Purpose of the Scheme

15.     The purpose of the scheme to defraud was for CONNERTON to enrich himself by defrauding victim-investors out of money and property by means of materially false and fraudulent pretenses, representations, and promises.

### The Manner and Means of the Scheme

The manner and means by which CONNERTON sought to accomplish and did accomplish the scheme included the following:

16.     It was a part of the scheme to defraud that CONNERTON would and did seek out investors and potential investors through personal contacts and via the internet, including through a popular internet dating site, and would and did solicit women he met online and their friends to invest in his company by selling them Safety Tech Securities.

17.     It was further part of the scheme to defraud that CONNERTON falsely represented

4

to victim-investors and potential victim-investors the amount of money he was taking out of the company, including by way of an investor update sent via email to be circulated to investors and potential investors stating among other things, "I have reduced my draw as of January 2008 to near or less than half of what I am allowed in the operating agreement."

18.     It was further part of the scheme to defraud that CONNERTON falsely represented to victim-investors and potential victim-investors, including in a PowerPoint presentation, that the Occupational Safety and Health Administration ("OSHA") had a mandate that would require the use of his "product" in all medical gloves.

19.     It was further part of the scheme to defraud that CONNERTON failed to disclose and failed to inform victim-investors and potential victim-investors that his application for a patent from the United States Patent and Trademark Office had been initially rejected on December 19, 2013 and was finally rejected on June 26, 2014. More specifically, in or around January 2014 CONNERTON circulated a document described as a Comprehensive Investor Update, in which he discussed the issue of seeking a patent but failed to disclose that the patent application had been initially rejected approximately one month earlier.

20.     It was further part of the scheme to defraud that in or about September 2015, CONNERTON circulated a document described as an Investor Update in which he discussed the issue of seeking a patent, but failed to disclose that the patent application that he had submitted to the Patent and Trademark Office had been initially rejected in December of 2013 and thereafter finally rejected in June of 2014.

21.     It was further part of the scheme to defraud that CONNERTON falsely represented to victim-investors and potential victim-investors the value of the company by making, among others, the following false statements:

a. that there was potential for a return of ten (10) times their investment;

b. that while he represented an initial valuation of $60 million, he now believes that the technology is worth much more than originally assumed;

c. that the value of the technology is as high as at $400 million;

d. that the product could sell for between $300 million and $600 million; and

e. that the returns to the company over ten years ranged from $33 million ("conservative estimate") to $1.7 billion ("optimistic estimate").

22.    It was further part of the scheme to defraud that CONNERTON falsely represented to victim-investors and potential victim-investors the background and credentials of one of the medical doctors with whom he was consulting, including falsely stating that the doctor chaired several committees at the Centers for Disease Control and Prevention ("CDC") and falsely stating that the doctor was one of the four leading consultants to the federal government on bio-terrorism.

23.    It was further part of the scheme to defraud that CONNERTON falsely represented to victim-investors and potential victim-investors that the funds they invested would be used to fund research and development, for product testing, for business expenses, and for legal fees, and did not disclose that he would and did directly use their funds to cover his own personal living expenses.   For many of the months during the scheme, CONNERTON took more than the amount of money he represented he would take by way of his draw or salary including taking money directly to pay for his day-to-day living expenses, his residential expenses (i.e., rent), restaurants, eye glasses, cable bills, and on two separate instances diamond engagement rings from Tiffany & Co.

24.    It was further part of the scheme to defraud that CONNERTON falsely represented to victim-investors in an e-mail communication sent in interstate commerce that the company was an "open book, meaning any investor can look at the books at any time.   No Bernie Madof's [sic] here!" when in truth and in fact the company was not an open book and investors were not made

privy to the true use of the funds. In this regard, CONNERTON denied investors' requests for financial information and neither Safety Tech nor CONNERTON provided any financial statements, much less U.S. GAAP-compliant financial statements, to prospective investors.

25. It was a further part of the scheme to defraud that CONNERTON falsely and fraudulently represented the level of interest, if any, that actually existed on behalf of glove manufacturers, including falsely representing, among other things, that:

a. "they [a major corporation] call me weekly many times;"

b. "I am receiving phone calls, even today, from other interested parties and companies that I have offered . . . the right to sub-license . . . I am in a unique position in that I have no lack of interest regarding my technology."

c. "we presently have contact and have begun discussions with every major surgical and exam glove company in the word. In addition, we are in detailed discussions with Kraton Corporation, the largest synthetic latex manufacturer in the world;"

d. "We are I believe in the process of discussing a 'joint development agreement' with Kraton Corp in which money will be coming across the table;" and

e. "We are scheduled to begin our final lab work in a few weeks and this will be it in preparation for meeting with the major glove companies . . . and the four major surgical glove companies in the world. They all want what we have!!!"

In truth and in fact, and as CONNERTON well knew, these statements were not accurate and were materially false and misleading to victim-investors and potential victim-investors.

26. It was further part of the scheme to defraud that after prospective investors expressed an interest in potentially investing in Safety Tech Securities, CONNERTON sought to create the appearance of legitimacy by preparing and executing official-looking documents and investment contracts termed "Subscription Agreements" that he executed on behalf of Safety Tech as "Manager."

27. It was further part of the scheme to defraud that on or about September 23, 2015, CONNERTON falsely represented to certain victim-investors that "I will go on the record to state

that there is not a single investor that will lose one dollar invested in Safety Technologies."

28. It was further part of the scheme to defraud that in order to raise additional capital and to convince victim-investors that their investment was safe and secure, CONNERTON falsely represented that he was in the final stages of selling the technology, including falsely representing that: (i) he believed a deal could potentially be achieved in 6 to 10 months; (ii) multiple major glove manufacturers were interested in Safety Tech's technology and that a lucrative licensing deal or sale of the company was imminent; (iii) additional funds would be used to finish prototyping and to secure a commercial agreement; (iv) money was needed to "build a landing strip for this project!;" and (v) he firmly believed that the finish is now just a matter of months.

29. It was further part of the scheme to defraud that CONNERTON caused more than 50 victim-investors to provide him more than $2 million based on false and fraudulent pretenses representations and promises.

30. It was further part of the scheme to defraud that CONNERTON failed to use the money as represented for the benefit of the company, such as for research development and testing as had been represented, and instead used the investors' funds that were sent to the Safety Tech bank accounts directly for his own personal benefit, including withdrawing large amounts of cash, paying personal expenses such as rent, restaurants, day-to-day bills, and repaying loans to an earlier investor.

31. It was further part of the scheme to defraud that in December of 2009, CONNERTON sent an investor update stating in part that "I have reduced my draw as of January 2008 to near or less than half of what I am allowed in the operating agreement," yet for many of the months thereafter, he took a larger portion of funds for himself and for his personal use than represented to the investors.

32.     On or about the dates set forth in each count below, in the District of Connecticut and elsewhere, for the purpose of executing and attempting to execute this scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, CONNERTON did knowingly transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals and sounds, each wire as set forth below constituting a separate count of this Indictment:

| Count | Date | Description of Use of Interstate Wires and Wire Communication |
|-------|------|---------------------------------------------------------------|
| 1 | 2/24/14 | E-mail from CONNERTON from his e-mail address tjc@tjcinvents.com to victim-investor M.C. stating in part "In response to your previous question: what are the patent issues? We are presently patent pending. . . ." and failing to disclose that the patent application had been initially rejected in December 2013. |
| 2 | 9/9/14 | E-mail from CONNERTON from his e-mail address tjc@tjcinvents.com to victim-investor T.H. stating in part "Our sale of this technology now involves discussions with companies such as Kraton Corporation. . . . They call me weekly many times." |
| 3 | 12/30/14 | E-mail from CONNERTON from his e-mail address tjc@tjcinvents.com to victim-investor J.S.H. stating in part "any funds realized from additional investors are to be utilized for any further development work, overhead, legal fees, and resources necessary to complete the negotiations to reach the point of sale.   The investment will not be used to pay prior investors or accrued salary" |
| 4 | 2/20/15 | Wire transfer of funds of $27,500 from the Bank America account of J.S.H. to a Safety Technologies LLC account at People's United Bank that CONNERTON controlled, account ending in 2615 |
| 5 | 4/14/15 | E-mail from CONNERTON from his e-mail address tjc@tjcinvents.com to victim-investors M.R. and M.C. stating in part "the valuation of the company based upon the new price of the units has gone from 5 million to 12 million. . . I represented to you and [   ] an initial valuation of 60 million [of the technology] of 60 million.   We now believe that our technology is worth much more." |

| Count | Date | Description of Use of Interstate Wires and Wire Communication |
|-------|------|---------------------------------------------------------------|
| 6 | 4/16/15 | E-mail from CONNERTON from his e-mail address tjc@tjcinvents.com to victim-investor T.H. attaching a document with hypothetical return scenarios for cumulative revenue ranging from $100 million to $400 million and returns from 9.1 times investment to as high as 36.4 times investment. |
| 7 | 4/21/15 | E-mail from CONNERTON from his e-mail address tjc@tjcinvents.com to victim-investor M.R. stating in part "I appreciate your willingness to possibly help me with completing the final (I hope) capital raise.  We are calling this our 'landing strip' . . . . It truly is the final validation of all of the concepts of our science.  We have it!" |
| 8 | 8/24/15 | E-mail from CONNERTON from his e-mail address tjc@tjcinvents.com to victim-investor S.M. stating in part "this brings the value of the company to $12,000,000. . . this is not to be confused with the value of the technology with our previous valuation represented a $60 million value and we now believe to be $400 million." |
| 9 | 9/23/15 | E-mail from CONNERTON from his e-mail address tjc@tjcinvents.com to victim-investor S.M. stating in part "I will go on the record to state that there is not a single investor that will lose one dollar invested in Safety Technologies!" |
| 10 | 11/23/15 | E-mail from CONNERTON from his e-mail address tjc@tjcinvents.com to victim-investor H.B.H. including an investor presentation stating, among other representations, that the company had a valuation at $11.25 million and a potential for a 10x return. |
| 11 | 2/8/16 | E-mail from CONNERTON from his e-mail address tjc@tjcinvents.com to victim-investor H.B.H. stating in part "we are nearing the point of sale rapidly and all investors will be made whole." |
| 12 | 3/19/16 | E-mail from CONNERTON from his e-mail address tjc@tjcinvents.com to victim-investor H.B.H. stating in part "the meeting went very well.  We ended it with the talk of a 'deal' which would be a substantial deposit in order for them to 'play' with the material/technology.... I made it very clear to them that I would be marching on to the next interested corporate partner." |

All in violation of Title 18, United States Code, Sections 1343 and 2.

COUNT THIRTEEN
(Mail Fraud)

33.     Paragraphs 1 through 31 are realleged herein.

10

34.     From in or about June 2009 and continuing until the date of this Indictment, in the District of Connecticut and elsewhere, defendant CONNERTON knowingly, willfully, and with intent to defraud, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme is set forth above, and for the purpose of executing such scheme did knowingly and willfully cause certain items to be delivered by United States Mail and by private commercial interstate carrier according to the directions thereon.

35.     It was part of scheme to defraud that CONNERTON falsely and fraudulently represented to victim-investors, including victim-investor J.S.H., that he would use their money for research and development and for the business purposes of Safety Tech.

36.     It was further part of the scheme to defraud that CONNERTON caused victim-investors, including victim-investor J.S.H., to execute a Subscription Agreement.

37.     It was further part of the scheme to defraud that on or about February 11, 2015, CONNERTON executed a Subscription Agreement as manager with victim-investor J.S.H. as subscriber pursuant to which he sold to her 27.5 units of Safety Tech in exchange for $27,500.

38.      It was further part of the scheme to defraud that CONNERTON caused victim-investor J.S.H. to wire $27,500 to a Safety Tech account at People's United Bank that CONNERTON controlled, account ending in 2615.

39.     On or about February 20, 2015, in the District of Connecticut and elsewhere, for the purpose of executing and attempting to execute the scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises as described above, CONNERTON did knowingly and willfully cause to be delivered by United States Mail and private commercial interstate carrier according to the directions thereon, a

11

priority mail express package containing a Safety Tech Subscription Agreement to victim-investor J.S.H. at her address located in Acton, Massachusetts.

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS FOURTEEN THROUGH THIRTY-ONE
(Securities Fraud)

40.     Paragraphs 1 through 32 and 34 through 39 are realleged herein, and describe CONNERTON's employment of manipulative and deceptive devices and contrivances and his scheme and artifice to defraud.

41.     As offered by CONNERTON to the victim-investors, the sale of "Units" representing small equity pieces of Safety Tech, as sold through solicitations together with the "Subscription Agreements," were securities within the meaning of the federal securities laws.

42.     On or about the dates listed below, in the District of Connecticut and elsewhere, defendant CONNERTON unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, would and did use and employ, in connection with the sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud upon investors as follows, each such instance as set forth below constituting a separate count of this Indictment:

| Count | Date | Sale of Security and Use of Interstate Commerce to Employ the Scheme and which Operated as a Fraud Upon Investors |
|---|---|---|
| 14 | 4/5/12 | Sale of Safety Tech Securities to victim-investor S.A.S. for $25,000, which sale was executed by way of a $25,000 check (#103) drawn from the account of S.A.S. at Capital One and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 15 | 6/12/12 | Sale of Safety Tech Securities to victim-investor K.W. for $25,000, which sale was executed by way of a $25,000 check (#1276) drawn from the account of K.W. at Apple Bank and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 16 | 8/2/12 | Sale of Safety Tech Securities to victim-investor M.C. for $50,000, which sale was executed by way of a $50,000 check (#1323) drawn from the account of M.C. at Bank of America and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 17 | 10/16/12 | Sale of Safety Tech Securities to victim-investor C.H. for $15,000, which sale was executed by way of a $15,000 check (#1580) drawn from the account of C.H. at Wachovia Securities and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 18 | 11/16/12 | Sale of Safety Tech Securities to victim-investor C.H. for $10,000, which sale was executed by way of a $10,000 check (#1587) drawn from the account of C.H. at Wachovia Securities and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 19 | 12/27/12 | Sale of Safety Tech Securities to victim-investor S.M. for $25,000, which sale was executed by way of a $25,000 check (#946) drawn from the account of S.M. at Citizen's Bank and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 20 | 2/8/13 | Sale of Safety Tech Securities to victim-investor S.M. for $75,000, which sale was executed by way of a $75,000 check (#971) drawn from the account of S.M. at Citizen's Bank and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 21 | 3/25/13 | Sale of Safety Tech Securities to victim-investor L.M. for $50,000, which sale was executed by way of a $50,000 check (#2594) drawn from the account of L.M. at Fairfield County Bank and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |

| Count | Date | Sale of Security and Use of Interstate Commerce to Employ the Scheme and which Operated as a Fraud Upon Investors |
|---|---|---|
| 22 | 7/25/13 | Sale of Safety Tech Securities to victim-investor M.C. for $25,000, which sale was executed by way of a $25,000 check (#1298) drawn from the account of M.C. at Bank of America and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 23 | 8/20/13 | Sale of Safety Tech Securities to victim-investors M.R. and L.R. for $25,000, which sale was executed by way of a $25,000 check (#110) drawn from the account of L.R. at Charles Schwab and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 24 | 9/25/14 | Sale of Safety Tech Securities to victim-investor L.M. for $25,000, which sale was executed by way of a $25,000 check (#2827) drawn from the account of L.M. at Fairfield County Bank and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 25 | 12/8/14 | Sale of Safety Tech Securities to victim-investor J.P. for $110,000, which sale was executed by way of a $110,000 check (#107) drawn from the account of J.P. at Citibank and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 26 | 2/20/15 | Sale of Safety Tech Securities to victim-investor J.S.H. for $27,500, which sale was executed by way of a $27,500 wire transfer of fund from the account of J.S.H. at Bank of America to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 27 | 5/14/15 | Sale of Safety Tech Securities to victim-investor T.H. for $13,750, which sale was executed by way of a $13,750 check (#4228) drawn from the account of T.H. at JPMorgan Chase Bank and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 28 | 9/26/15 | Sale of Safety Tech Securities to victim-investor S.M. for $25,000, which sale was executed by way of a $25,000 check (#108) drawn from the account of S.M. at Merrill Lynch and deposited to the Safety Tech account at People's United Bank ending in 2615 using a facility of interstate commerce. |
| 29 | 12/28/15 | Sale of Safety Tech Securities to victim-investor M.C. for $12,500, which sale was executed by way of a $12,500 check (#1524) drawn from the account of M.C. at Bank of America and deposited to the Safety Tech account at People's United Bank ending in 4995 using a facility of interstate commerce. |

| Count | Date | Sale of Security and Use of Interstate Commerce to Employ the Scheme and which Operated as a Fraud Upon Investors |
|-------|------|-------------------------------------------------------------------------------------------------------------------|
| 30 | 3/23/16 | Sale of Safety Tech Securities to victim-investor H.B.H. for $75,000, which sale was executed by way of a $75,000 check (#3685) drawn from the account of H.B.H. at JPMorgan Chase Bank and deposited to the Safety Tech account at People's United Bank ending in 4995 using a facility of interstate commerce. |
| 31 | 5/16/16 | Sale of 30 Units of Safety Tech to victim-investor G.N. for $30,000, which sale was executed by way of a $30,000 check (#2729) drawn from an account controlled by G.N. at Bank of America and deposited into the Safety Tech account at People's United Bank ending in 4995 using a facility of interstate commerce. |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

COUNTS THIRTY-TWO THROUGH THIRTY-SEVEN
(Money Laundering)

43. Paragraphs 1 through 32, 34 through 39, and 41 through 42 are realleged herein.

44. On or about the dates listed for each count below, in the District of Connecticut and elsewhere, defendants CONNERTON and ERICKSON (as charged in Count Thirty-Seven) did knowingly engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, all involving financial institutions which are engaged in, and the activities of which affect, interstate commerce, such property having been derived from specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, mail fraud in violation of Title 18, United States Code, Section 1341, and fraud in the sale of securities in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5 as follows:

| Count | Date | Defendant | Funds Attributable To: | Monetary Transaction |
|---|---|---|---|---|
| 32 | 7/6/12 | CONNERTON | Investment of Victim-Investor K.W. | Negotiated check number 1281 in the amount of $10,900 drawn from the Safety Tech account at People's United Bank ending in 2615 to purchase six cashier's checks payable to Thomas J. Connerton. |
| 33 | 2/14/13 | CONNERTON | Investment of Victim-Investor S.M. | Negotiated check number 1327 in the amount of $22,902 drawn from the Safety Tech account at People's United Bank ending in 2615 to purchase a cashier's check 7642533 in the amount of $19,902 payable to Tiffany & Co.; cashier's check number 7642534 for $1,000; a $1,500 deposit; and $500 cash. |
| 34 | 9/30/15 | CONNERTON | Investment of Victim-Investor S.M. | Withdrew $10,221 from the Safety Tech account at People's United Bank ending in 2615 to purchase a cashier's check 8398492 in the amount of $5,221 payable to Jean Erickson and cashier's check 8398493 in the amount of $5,000 payable to Thomas Connerton. |
| 35 | 3/28/16 | CONNERTON | Investment of Victim-Investor H.B.H. | Negotiated check number 1039 in the amount of $22,000 drawn from the Safety Tech account at People's United Bank ending in 4995 to purchase a cashier's check 8542139 in the amount of $21,469.19 payable to Tiffany & Co. and $530.81 cash. |
| 36 | 5/21/16 | CONNERTON | Investment of Victim-Investor G.N. | Negotiated check number 1056 in the amount of $19,692.71 from the Safety Tech People's United Bank account ending in 4995 to purchase three cashier's checks numbered 8625987; 8625988; and 8625989, each in the amount of $5,000. |
| 37 | 6/8/16 | CONNERTON ERICKSON | Investment of Victim-Investor G.N. | ERICKSON transferred $15,000 from her account at First Niagara Bank ending in 2146 to her account at First Niagara Bank ending in 3599. |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT THIRTY-EIGHT
(Money Laundering Conspiracy)

45.     Paragraphs 1 through 32, 34 through 39, 41 through 42, and 44 are realleged herein.

46.     Beginning in or about March 2016 and continuing until the date of this Indictment, in the District of Connecticut and elsewhere, defendants CONNERTON and ERICKSON did unlawfully and knowingly combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury to commit offenses under Title 18, United States Code, Sections 1956 and 1957, that is:

> a.     to conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activities, that is wire fraud, mail fraud and securities fraud as described in this Indictment, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, that is wire fraud, mail fraud and securities fraud as described in this Indictment, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18 United States Code, Section 1956(a)(1)(B)(i); and

> b.     knowingly to engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 and which property was derived from a specified unlawful activity, that is wire fraud, mail fraud and securities fraud as described in this Indictment, in violation of 18 U.S.C. § 1957.

## Purpose of Money Laundering Conspiracy

47.    The purpose of the conspiracy was for the defendants and others known and unknown to the Grand Jury to conceal the nature and source of the fraudulent proceeds obtained through the sale of Safety Tech Securities and to do so, in part, by moving fraudulently obtained funds through multiple accounts by purchasing multiple bank checks and negotiating those bank checks to conceal the funds and by engaging in monetary transactions in amounts greater than $10,000, such as negotiating checks, purchasing cashier's or teller checks, transferring funds from account to account, and by converting a portion of the funds into cash.

## Background Regarding Money Laundering Conspiracy

48.    On or about May 6, 2016, CONNERTON was provided with a formal Order of Investigation by the SEC, and interviewed under oath by the SEC, Boston Regional Office.

49.    On or about June 6, 2016, the SEC informed counsel for CONNERTON that among the relief that the SEC could seek, including injunctive relief, was that the SEC could possibly seek and obtain a restraint on CONNERTON's assets in some form.

50.    On or about June 8, 2016, pursuant to a court-authorized search warrant, a search was conducted of the residence of CONNERTON and ERICKSON during which the defendants indicated to the investigative agents that they were aware a restraint on CONNERTON's assets was a possibility.

## Manner and Means of the Money Laundering Conspiracy

The manner and means and acts undertaken through which the CONNERTON and ERICKSON sought to accomplish and did accomplish this conspiracy include those set forth above in this Indictment, as well as, among others, the following:

51.    It was part of the conspiracy that CONNERTON would and did deposit into the Safety Tech accounts checks sent to Safety Tech by victim-investors, the funds of which were

represented to the victim-investors to be used for legitimate business purposes including, among other things, research and development, testing, marketing, and legal fees.

52.     It was a further part of the conspiracy that CONNERTON and ERICKSON, in an attempt to conceal the nature and source of funds received by Safety Tech from the sale of Safety Tech Securities and in an attempt to prevent the authorities and regulators, including the Federal Bureau of Investigation and the SEC, from locating the funds, would and did engage in monetary transactions in criminally derived property, which was derived from wire fraud, mail fraud and securities fraud as described in this Indictment, by negotiating checks and purchasing multiple bank checks or teller checks and negotiating the checks in order to move the fraudulent proceeds from one account to another.

53.     It was a further part of the conspiracy that on or about May 21, 2016, CONNERTON would and did negotiate check number 1056 from his People's United Bank account ending in 4995 in the amount of $19,692.71, drawn from funds having been fraudulently obtained from victim-investors, including G.N., and would and did purchase three cashier's checks dated on or about May 21, 2016, payable to Thomas Connerton as follows: check number 8625987 in the amount of $5,000; check number 8625988 in the amount of $5,000; and check number 8625989 in the amount of $5,000.

54.     It was a further part of the conspiracy that on or about June 6, 2016, ERICKSON, in an attempt to conceal the nature and source of funds received by Safety Tech from the sale of Safety Tech Securities and in an attempt to prevent the authorities and regulators, including the Federal Bureau of Investigations and the SEC, from locating the funds, would and did deposit the multiple bank checks into her personal account at First Niagara Bank (now known as KeyBank) as follows: check number 8625987 in the amount of $5,000; check number 8625988 in the amount of $5,000; check number 8625989 in the amount of $5,000; and $1,900 cash into her personal

account at First Niagara Bank ending in 2146.

55.    It was a further part of the conspiracy that on or about June 8, 2016, ERICKSON engaged in a financial transaction involving funds derived from a specified unlawful activity and in an attempt to conceal the nature and source of funds and in an attempt to prevent the authorities and regulators from locating the funds by transferring $15,000 from her account at First Niagara Bank ending in 2146 to her account at First Niagara Bank ending in 3599.

56.    It was a further part of the conspiracy that on or about June 8, 2016, ERICKSON engaged in a financial transaction involving funds derived from a specified unlawful activity and in an attempt to conceal the nature and source of funds and in an attempt to prevent the authorities and regulators from locating the funds by transferring $1,500 from her account at First Niagara Bank ending in 2146 to her account at First Niagara Bank ending in 3599.

57.    It was a further part of the conspiracy that on or about June 8, 2016, ERICKSON engaged in a financial transaction involving funds derived from a specified unlawful activity and in an attempt to conceal the nature and source of funds and in an attempt to prevent the authorities and regulators from locating the funds by withdrawing $18,000 from her account at First Niagara Bank ending in 3599 and purchasing two teller checks from First Niagara Bank, each in the amount of $9,000 and each made payable to the order of Jean Erickson, namely checks number 5547116378 and 5547116379.

58.    It was a further part of the conspiracy that on or about June 8, 2016, ERICKSON engaged in a financial transaction involving funds derived from a specified unlawful activity and in an attempt to conceal the nature and source of funds and in an attempt to prevent the authorities and regulators from locating the funds by depositing teller check number 5547116379 in the amount of $9,000 into her account at First Niagara Bank ending in 2146.

59.    It was a further part of the conspiracy that on or about July 7, 2016, ERICKSON

engaged in a financial transaction involving funds derived from a specified unlawful activity and in an attempt to conceal the nature and source of funds and in an attempt to prevent the authorities and regulators from locating the funds by depositing teller check number 5547116378 in the amount of $9,000 into her account at First Niagara Bank ending in 2146.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT THIRTY-NINE
### (Material False Statement)

60.     The allegations in Paragraphs 1 through 32, 34 through 39, 41 through 42, and 44 are realleged herein.

61.     On or about April 22, 2016, in the District of Connecticut, in a matter within the jurisdiction of the United States Department of Justice, Federal Bureau of Investigation ("FBI"), defendant ERICKSON did knowingly and willfully make a false, fictitious, and fraudulent material statement and representation to a Special Agent from the FBI namely, ERICKSON contacted the FBI and falsely represented her relationship with defendant Connerton by stating she was just an investor and that was her only relationship with Connerton when in truth and in fact, she was engaged to him and sharing a residence with him at the time, and moreover, in the same conversation, ERICKSON did knowingly and willfully make an additional false, fictitious, and fraudulent material statement and false representation to a Special Agent from the FBI, namely, ERICKSON falsely represented her address to the Special Agent.

All in violation of Title 18, United States Code, Section 1001.

## NOTICE OF FORFEITURE ALLEGATIONS
(Forfeiture Relating to Fraud Offenses)

62.     Upon conviction of any of the wire fraud offenses alleged in Counts One through Twelve, the mail fraud offense in Count Thirteen, or any of the securities fraud offenses alleged in Counts Fourteen through Thirty-One, THOMAS J. CONNERTON shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1341 (mail fraud), or 1343 (wire fraud), or Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud) including, but not limited to, the following:

Diamond Rings:

Two diamond rings purchased from Tiffany & Co. using cashier's check 8542139 in the amount of $21,469.19 which constitutes proceeds of or is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1343 or Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5.

Money Judgment:

A sum of money equal to the total amount of any property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1341 and 1343, and Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5.

63.     If any of the above-described forfeitable property, as a result of any act or omission of CONNERTON, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the Court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States

Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

All in accordance with Title 18, United States Code, Section 981(a)(1), as incorporated by Title 28, United States Code, Section 2461(c), and Rule 32.2(a), Federal Rules of Criminal Procedure.

## FORFEITURE ALLEGATION UNDER 18 U.S.C. § 982(a)
### (Money Laundering)

64.     Upon conviction of one or more of the money laundering offenses alleged in Counts Thirty-Two through Thirty-Eight of this Indictment, Defendants CONNERTON and ERICKSON shall forfeit to the United States of America pursuant to Title 18, United States Code, Section 982(a)(1), all right, title, and interest in any and all money and other property involved in each offense in violation of Title 18, United States Code, Sections 1957 and 1956(h) and all property traceable to such property, including:

> Diamond Rings:
>
> Two diamond rings purchased from Tiffany & Co. using cashier's check 8542139 in the amount of $21,469.19 which constitutes proceeds of or is derived from proceeds traceable to violations of Title 18, United States Code, Section 1957; and

> Money Judgment:
>
> A sum of money equal to the total amount of any property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Section 1957, and a sum of money equal to the total amount of money involved in each offense, or conspiracy to commit such offense, for which the defendant is convicted.

65. Upon conviction of the money laundering conspiracy offense alleged in Count Thirty-Nine of this Indictment, Defendants CONNERTON and ERICKSON shall forfeit to the United

23

States of America pursuant to Title 18, United States Code, Section 982(a)(1), all right, title, and interest in any and all money and other property involved in each offense in violation of Title 18, United States Code, Section 1956(h), and all property traceable to such property, and a sum of money equal to the total amount of money involved in each offense, for which the defendant is convicted.

66. If any of the above-described forfeitable property, as a result of any act or omission of the defendant(s), cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of said defendant(s) up to the value of the forfeitable property described above.

All in accordance with Title 18, United States Code, Section 982(a)(1), and Rule 32.2(a), Federal Rules of Criminal Procedure.

A TRUE BILL

/s/
FOREPERSON

UNITED STATES OF AMERICA

DEIRDRE M. DALY
UNITED STATES ATTORNEY

MICHAEL S. McGARRY
ASSISTANT UNITED STATES ATTORNEY

24