UNITED STATES

v.

THOMAS CONNERTON

No. 3:17-cr-47 (SRU)

## RULING ON MOTION FOR JUDGMENT OF ACQUITTAL

Thomas Connerton was charged via superseding indictment with twelve counts of wire fraud, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2 (counts one through twelve); one count of mail fraud, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2 (count thirteen); sixteen counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (counts sixteen through thirty-one); four counts of illegal monetary transactions, in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 2 (counts thirty-three through thirty-six); and one count of tax evasion, in violation of 26 U.S.C. § 7201 (count thirty-nine).[1] *See* Indictment, Doc. No. 65. The jury found Connerton guilty on all thirty-four counts on September 17, 2018. *See* Verdict, Doc. No. 201. Connerton now seeks a judgment of acquittal on all counts. *See* Oral Mot. for Acquittal, Doc. No. 180; Mem. in Supp. Mot., Doc. No. 221. For the following reasons, Connerton's motion is **denied.**

## I.     Background

The following general factual evidence was alleged by the government and introduced at trial. Additional facts will be set out below. The government alleged generally that Connerton set out to develop a puncture- and cut-resistant material for use in the surgical glove market

---

[1] Counts fourteen, fifteen, thirty-two, thirty-seven, and thirty-eight were charged but not submitted to the jury.

through his company, Safety Technologies, LLC ("Safety Tech"). In connection with that development, the government alleged that Connerton engaged in a scheme to defraud investors and potential investors, from roughly 2009 through 2017, by falsely representing the value of the company, the level of interest from glove companies, the ways in which Connerton was using investors' funds, the amount of money he was taking from the company, and the progress of the glove technology, among other misrepresentations.

At trial, the following Safety Tech investors testified for the government. Lorraine Ward, who met Connerton on a dating website, invested $12,500 in December 2011 Tr. 9/4/18, Doc. No. 189 at 669, 689-90; Ex. 222. Margaret Carlson, who met Connerton on a dating website, invested $50,000 in July 2012 (ex. 16) and $25,000 in July 2013 (ex. 22), and loaned Connerton $12,500 in December 2015 (ex. 29). Tr. 8/28/18, Doc. No. 186 at 112-13, 134, 143, 149. Cynthia Hofer, who went to college with Connerton but later reconnected on a dating website, invested $15,000 in October 2012 (ex. 17) and $10,000 in November 2012 (ex. 18). Tr. 8/29/18, Doc. No. 187 at 373-75, 380-81. Stacey Maclay, who met Connerton on a dating website, made the following investments: $25,000 in December 2012; $75,000 in February 2013; $25,000 in August 2013; $30,000 in August 2013; $45,000 in September 2013; $100,000 in April 2014; $50,000 in May 2014; and $25,000 in September 2015. Tr. 9/4/18, Doc. No. 189 at 511-13, 534, 545-47, 558, 583, 592; Ex. 139. Maclay also loaned Connerton $50,000 in October 2015. Tr. 9/4/18, Doc. No. 189 at 586; Ex. 139.

Lisa Manganiello, who met Connerton on a dating website, invested $50,000 in April 2013 (ex. 21) and $25,000 in September 2014 (ex. 24). Tr. 8/28/18, Doc. No. 186 at 209, 216; Tr. 8/29/18, Doc. No. 187 at 245. Jason Henry, who met Connerton through Carlson, invested $25,000 in Safety Tech in August 2013. Tr. 8/28/18, Doc. No. 186 at 50-51, 60; Ex. 1160.

Jeffrey Portanova, who met Connerton through Portanova's wife, invested $110,000 in Safety Tech in December 2014. Tr. 8/29/18, Doc. No. 187 at 307; Ex. 25. Joyce Shetler Holt, who met Connerton through Maclay, invested $27,500 in February 2015. Tr. 9/11/18, Doc. No. 197 at 1389-40, 1651; Ex. 26. Thomas Herlihy, who met Connerton through a friend, invested $13,750 in Safety Tech in May 2015. Tr. 9/4/18, Doc. No. 189 at 644, 660-61; Ex. 27. H. Brett Humphreys, who met Connerton at a cocktail party, invested $75,000 in March 2016. Tr. 9/12/18, Doc. No. 198 at 1826; Ex. 30.

In addition to investors, the government called as witnesses the following doctors who were connected to the Safety Tech project. Dr. Michael DiLuna, Chief of Pediatric Neurosurgery at Yale School of Medicine, met Connerton in 2006-2007 and advised him on some of the concerns doctors had with surgical gloves on the market at the time. Tr. 8/29/18, Doc. No. 188 at 425-26, 437-40; Ex. 1105 (email to Connerton about what surgeons look for in gloves). Dr. Walter Ettinger met Connerton in 2008 through Dr. Ettinger's financial advisor, and was, at that time, president of Massachusetts Memorial Medical Center, and invested $25,000 in Safety Tech. Tr. 9/5/18, Doc. No. 190 at 787-88, 793. Dr. Mark Russi, professor and doctor at Yale University, met Connerton in 2006 and, like Dr. DiLuna, advised him on doctors' concerns with surgical gloves. Tr. 9/5/18, Doc. No. 190 at 872, 875, 894. Dr. Russi did not invest money in Safety Tech, but was given a "sweat equity share in the company." Tr. 9/5/18, Doc. No. 190 at 880.

The following representatives from glove companies and manufacturing/testing companies testified: Robert Simmonds from Intertek (tr. 9/5/18, doc. no. 191 at 940); Paul Bottcher from Medline (tr. 9/6/18, doc. no. 192 at 1065); Susan Mueller from Cardinal Health (tr. 9/6/18, doc. no. 192 at 1153); Kenneth Pouliot from Kraton Polymers (tr. 9/6/18, doc. no. 192

at 1184; tr. 9/6/18, doc. no. 193 at 1226); Jeanne Marie Lahey from Molnlycke (tr. 9/10/18, doc. no. 194 at 1315); and David Schuck from Killian Latex (tr. 9/10/18, doc. no. 194 at 1400).

In addition, the following government officials testified about the investigations into Connerton and Safety Tech and various federal regulations: Amee Bhatt from the Occupational Safety and Health Administration ("OSHA") (tr. 9/4/18, doc. no. 189 at 727); Alfred Day from the Securities and Exchange Commission ("SEC") (tr. 9/5/18, doc. no. 190 at 812); Elizabeth McCartney from the Federal Bureau of Investigations ("FBI") (tr. 9/5/18, doc. no. 191 at 1010; tr. 9/6/18, doc. no. 193 at 1274; tr. 9/10/18, doc. no. 195 at 1463); Brian Hanlon from the United States Patent and Trademark Office ("USPTO") (tr. 9/11/18, doc. no. 196 at 1569); Stephen West from the FBI (tr. 9/11/18, doc. no. 197 at 1690); and Sean Darling from the Internal Revenue System ("IRS") (tr. 9/11/18, doc. no. 197 at 1752; tr. 9/12/18, doc. no. 198 at 1824).

Connerton testified in his own defense. Tr. 9/12/18, Doc. No. 199 at 1955; Tr. 9/13/16, Doc. No. 200 at 2114. The defense also called Scott Berry, who worked with Connerton in the beginning stages of Safety Tech to value the company (tr. 9/12/18, doc. no. 198 at 1882); and David Quinlan, a mechanical engineer (tr. 9/13/18, doc. no. 200 at 2196). The jury returned its guilty verdict on all counts on September 17, 2018. *See* Verdict Form, Doc. No. 201.

## II.     Motion for Judgment of Acquittal

### A.  Standard

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. "A defendant seeking to overturn a conviction on the ground that the evidence was insufficient bears a heavy burden." *United States v. Best*, 219 F.3d 192, 200 (2d Cir. 2000), *cert. denied*, 532 U.S. 1007 (2001). The reviewing

court must view the evidence in the light most favorable to the prosecution and must reject the sufficiency challenge if it concludes that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) ("[t]he ultimate question is not whether [the court believes] the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether *any rational trier of fact could so find*" (emphasis in original)). A reviewing court must consider the evidence as a whole, not in isolation. *Best*, 219 F.3d at 200; *see also United States v. Memoli*, 2015 WL 1525864, at *2 (D. Conn. Apr. 2, 2015) ("In order to prevail on a Rule 29 Motion, Defendant must establish that the *totality* of the evidence is insufficient to convict him—it is irrelevant that one piece of evidence, standing alone, would not have been enough." (Emphasis in original).). The "pieces of evidence must be viewed 'not in isolation, but in conjunction.'" *Memoli*, 2015 WL 1525864, at *2 (quoting *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989)).

Further, the court must defer to the jury's determination of the weight of the evidence, credibility of witnesses, and competing inferences that can be drawn from the evidence. *Best*, 219 F.3d at 200. The district court must "assum[e] that the jury resolved all questions of witness credibility and competing inferences in favor of the prosecution." *United States v. Abu–Jihaad*, 630 F.3d 102, 134 (2d Cir. 2010) (internal citations omitted); *see also United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998) ("We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of competing inferences that can be drawn from the evidence."). The jury is "exclusively responsible" for determinations of witness credibility; *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993); and the court must be "careful to avoid usurping the role of the jury since Rule 29 does not provide the trial

court with an opportunity to substitute its determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (internal quotation marks omitted). The court should defer to the jury's credibility assessments and intrude upon that function only where "exceptional circumstances can be demonstrated" such as when "testimony is patently incredible or defies physical realities." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

B. Discussion

Connerton argues that he is entitled to a judgment of acquittal on all counts of conviction. *See* Mem. in Supp. Mot. for Acquittal ("Mem. in Supp."), Doc. No. 221. He generally asserts that the government failed to establish that he perpetuated a scheme to defraud his investors and/or made materially false statements. With respect to the mail and wire fraud counts, Connerton argues that the government failed to disprove his good faith and, therefore, failed to prove fraudulent intent. *Id*. at 5-8. Further, Connerton argues that the government failed to prove that the mailing in the mail fraud count was in furtherance of the alleged fraud. *Id*. at 13-16. With respect to the securities fraud counts, Connerton argues that the government failed to prove that various statements that Connerton made were "material" to the investors' decisions to invest. *Id*. at 29-31. With respect to the illegal monetary transaction counts, Connerton argues that the government failed to prove that the expenditures were undertaken to conceal the nature or source of the proceeds. *Id*. at 10-11. With respect to the tax evasion count, Connerton argues that the government improperly included tax years 2004 and 2005. *Id*. at 8-9.

For the reasons that follow, Connerton's Motion for Judgment of Acquittal is **denied** with respect to all counts of conviction.

1. *Fraud Counts*

Connerton was convicted of twelve counts of wire fraud, in violation of 18 U.S.C. § 1343 (counts one through twelve); one count of mail fraud, in violation of 18 U.S.C. § 1341 (count thirteen); and sixteen counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (counts sixteen through thirty-one). *See* Verdict, Doc. No. 201.

"To prove mail or wire fraud, the government must show (1) a scheme to defraud victims (2) by obtaining their money or property (3) furthered by the use of interstate mail or wires." *United States v. McGinn*, 787 F.3d 116, 122 (2d Cir. 2015). With respect to the scheme to defraud victims, "[t]he government must further establish that the defendant had fraudulent intent or 'a conscious knowing intent to defraud,' and that some harm or injury to the property rights of the victim was contemplated." *Id*. at 123 (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). The Second Circuit has held, though, that "a defendant's belief 'that ultimately everything would work out so that no one would lose any money' does not excuse fraudulent conduct." *Id*. (quoting *United States v. Rossomando*, 144 F.3d 197, 199-201 (2d Cir. 1998)).

To prove securities fraud, the government must prove that, in connection with a sale of securities, the defendant: "(1) employed a device, scheme or artifice to defraud, or made an untrue statement of material fact which made what was said, under the circumstances, misleading, or engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller; (2) participated in the scheme to defraud knowingly, willfully and with intent to defraud; and (3) knowingly used, or caused to be used, instrumentalities of interstate commerce in furtherance of the scheme to defraud." *United States v. Teyibo*, 877 F. Supp. 846, 861 (S.D.N.Y. 1995).

Accordingly, for purposes of all fraud counts, the government must prove that Connerton perpetuated a scheme to defraud, furthered by the use of mail and/or wires, with an intent to defraud.

a. Scheme and Intent to Defraud

Connerton argues generally that the government failed to prove that he engaged in a scheme to defraud and, relatedly, that he had the intent to defraud, because the government failed to disprove Connerton's good faith. The government alleged that Connerton engaged in a scheme to defraud investors and potential investors in a number of ways that generally improperly misrepresented the worth and success of Safety Tech and the glove technology Connerton was developing. Taking the evidence in the light most favorable to the government, the jury reasonably could have found that there was a scheme and intent to defraud.

i. Physician Involvement

The government alleged that as part of his scheme to defraud investors, Connerton inflated the role that several prominent doctors played in the formation and/or management of Safety Tech. Indeed, many Safety Tech investors testified that Connerton provided them with information about the involvement of certain doctors including Dr. Mark Russi from Yale, Dr. Walter Ettinger, and Dr. Michael DiLuna from Yale.

Investors testified that Connerton told them that Russi was "one of the founders of Safety Tech." Tr. 8/28/18, Doc. No. 186 at 64 (Henry); Ex. 1154 (email to Henry); Tr. 9/4/18, Doc. No. 189 at 655 (Herlihy); Ex. 605 (April 2015 email to Herlihy); Ex. 1100 (email to Humphreys); Ex. 1200 (email to investor George Nicita); Ex. 1204 (email to Nicita). Connerton also testified that Russi was a founder. Tr. 9/12/18, Doc. No. 199 at 1973. Russi testified, however, that he was not a founder of Safety Tech. Tr. 9/5/18, Doc. No. 190 at 883, 885, 889. Connerton also

told investors that DiLuna was part of a "product development team."  Ex. 151 (email to Carlson); Ex. 1901 (investor update).  DiLuna testified, however, that that was false.  Tr. 8/29/18, Doc. No. 188 at 446-47.  Connerton told investors that Russi and DiLuna were part of a physician development and advisory board.  *See* Ex. 1156; Tr. 8/28/18 at 67-68 (Henry); Tr. 8/28/18, Doc. No. 186 at 214 (Manganiello); Tr. 8/29/18, Doc. No. 187 at 252 (Manganiello); Tr. 8/29/18, Doc. No. 187 at 383 (Hofer); Tr. 9/4/18, Doc. No. 189 at 543, 588 (Maclay); Ex. 133 (email to Maclay); Tr. 9/11/18, Doc. No. 197 at 1642-43 (Holt); Ex. 1902 (email to investor Mark Ricca).   Connerton also testified that Russi was on the advisory board.  Tr. 9/12/18, Doc. No. 199 at 2000.  Both Russi and DiLuna testified, however, that they were not a part of any such board.  Tr. 9/5/18, Doc. No. 190 at 889-91 (Russi); Tr. 8/29/18, Doc. No. 188 at 448 (DiLuna).

Further, Connerton told investors that Russi and DiLuna, among others, "affirmatively stated that the retention of the tactile feel and grip with our technology in the latex film is intact." Ex. 1156 (email to Henry); Ex. 1902 (email to Ricca).  Russi and DiLuna testified, however, that they did not say that.  Tr. 9/5/18, Doc. No. 190 at 892 (Russi); Tr. 8/29/18, Doc. No. 188 at 450 (DiLuna).  Connerton also told investors that Russi "sits on several committees" at the Center for Disease Control ("CDC"), was "a leading consultant to the Federal Government on bio-terrorism," and was on the "pandemic committee."  Ex. 133 (12/10/15 email to Maclay); Tr. 9/4/18, Doc. No. 189 at 656 (Herlihy); Ex. 605 (April 2015 email to Herlihy); Tr. 9/11/18, Doc. No. 197 at 1642-43 (Holt); Ex. 1100 (email to Humphreys); Ex. 1200 (email to Nicita); Ex. 413 (email to Ricca).  Russi testified, however, that none of that was accurate.  Tr. 9/5/18, Doc. No. 190 at 884-85.  In fact, Russi emailed Connerton in 2009, before Connerton made many of those

representations, and told Connerton he was not on CDC committees. Tr. 9/5/18, Doc. No. 190 at 886; Ex. 356.

Connerton also informed his investors in an investor update that Russi was part of Safety Tech's negotiation team. Tr. 9/4/18, Doc. No. 189 at 652 (Herlihy); Ex. 601 (email to Herlihy); Tr. 9/11/18, Doc. No. 197 at 1663 (Holt); Ex. 179 (investor update). Russi testified, however, that he was not part of any negotiation team. Tr. 9/5/18, Doc. No. 190 at 899. Connerton also stated that Russi "estimates a potential sales price premium of at least 20 percent for gloves with our technology." Ex. 453 (email to Carlson). Russi testified, however, that he did not say that. Tr. 9/5/18, Doc. No. 190 at 904. Further, Connerton told investors that Russi and DiLuna were investors in Safety Tech. Tr. 8/29/18, Doc. No. 186 at 253 (Manganiello's testimony); Tr. 9/14/18, Doc. No. 189 at 691 (Ward's testimony); Ex. 1902 (email to Ricca). Both Russi and DiLuna testified, however, that they were not investors. Tr. 9/5/18, Doc. No. 190 at 880, 891 (Russi); Tr. 8/29/18, Doc. No. 188 at 449 (DiLuna). Connerton also told Carlson that Russi and Ettinger provided assistance valuing the technology and worked on glove market analysis. Ex. 151 (email to Carlson). Russi and Ettinger testified, however, that they did not do so. Tr. 9/5/18, Doc. No. 190 at 794-95 (Ettinger); Tr. 9/5/18, Doc. No. 190 at 899-900 (Russi).

Many investors testified that Connerton's representations about the doctors' involvement was important in making their investment decisions. Henry testified that it was important to his decision to invest that there was a physician development advisory board filled with prominent doctors. Tr. 8/28/18, Doc. No. 186 at 68; *id.* at 71 (Henry testifying that he would have wanted to know if DiLuna was not involved). Manganiello testified that the involvement of prominent doctors on an advisory board was important to her in her decision to invest because "if they were in the deal, why wouldn't I be?" Tr. 8/29/18, Doc. No. 187 at 252. She also testified that the

fact that the doctors were also investors in Safety Tech it was "absolutely" a factor she considered when deciding whether to invest because it made her feel as though her investment was safe. *Id.* at 253. Hofer testified that she was impressed by the credentials of the doctors on the advisory board, and their involvement was important to her decision to invest because it made her feel more comfortable. *Id.* at 384. Maclay testified that Russi's involvement on the advisory board was "very important" to her investment decision because of his involvement with the CDC and various committees. Tr. 9/4/18, Doc. No. 189 at 543, 588. Further, Herlihy testified that Russi's involvement on the advisory board was important to his investment decision because his credentials give the project "viability." *Id.* at 652, 656. Overall, Herlihy testified that he invested because of the credentials of the doctors on the board, because things seemed "very positive," and because he would get a speedy return on his investment. *Id.* at 660. Holt testified that Russi's involvement with Safety Tech, as Connerton described it, was very important to her investment decision. Tr. 9/11/18, Doc. No. 197 at 1663

### ii. OSHA Mandate

The government alleged that as part of his scheme to defraud investors, Connerton told investors that OSHA would mandate the use of his gloves once the technology was finished. Many of the investors testified that Connerton did, in fact, say that there was an OSHA mandate that would require the use of Safety Tech's technology. *See, e.g.,* Tr. 9/4/18, Doc. No. 189 at 541 (Maclay testifying about email from Connerton (doc. no. 113) in which he references an OSHA mandate); *id.* at 656 (Herlihy testifying that Connerton told him about the OSHA mandate); *id.* at 682 (Ward testifying about same); Tr. 9/11/18, Doc. No. 197 at 1658 (Holt testifying about same); Tr. 9/12/18, Doc. No. 198 at 1835 (Humphreys testifying about same); Ex. 1107 (email to Humphreys).

Specifically, Henry testified that Connerton told him that "OSHA was going to require these types of gloves to be used in … the medical field." Tr. 8/28/18, Doc. No. 186 at 58, 64-65 (Henry testifying Connerton said use of the technology would be a "requirement"). Carlson testified that Connerton told her that OSHA "had a mandate that if this technology had been brought to market, that it would have to be used by everyone in the medical field because OSHA would mandate … employers [to offer] their employees the ultimate protection in cuts and pricks and tears." *Id.* at 116; *see also id.* at 127. Portanova testified that Connerton told him that new OSHA regulations would "effectively make his glove the go-to glove as far as use in any OSHA-required activities." Tr. 8/29/18, Doc. No. 187 at 306. Holt testified that Connerton told her that hospitals would "require his gloves." Tr. 9/11/18, Doc. No. 197 at 1666. Connerton also told investors that the "OSHA mandate" was the reason that Ettinger told Connerton that "'the day [Connerton's] technology becomes available it will be in [Ettinger's] hospital next week.'" Ex. 252 (email to Humphreys). Ettinger testified, however, that he did not say that. Tr. 9/5/18, Doc. No. 190 at 800.

Connerton testified that he got the information about the OSHA mandate in a January 18, 2007 email from Russi. Tr. 9/12/18, Doc. No. 199 at 2015-17. Connerton often forwarded that email to investors when he discussed the OSHA mandate. *See, e.g.*, Ex. 252 (email to Humphries). Russi's email states, though, not that there would be any OSHA mandate to use the gloves, but that Russi "would anticipate that OSHA would treat [the gloves] as it currently treats other engineering solutions, namely require that employers *consider*, and where effective, implement it." *Id.* (emphasis added). Similarly, Bhatt, the OSHA representative, testified, that the OSHA standard at issue, section 1910.1030, "does not define specifically what type or brand of glove to use for each scenario" and that gloves with superior resistance to punctures would not

be required over other gloves so long as those were sufficiently protective.  Tr. 9/4/18, Doc. No. 189 at 735, 738; Ex. 1600.  Bhatt testified that OSHA requires a minimum standard for personal protective equipment, and employers could not provide materials that fell below that standard.  Tr. 9/4/18, Doc. No. 189 at 739.  Further, Bhatt testified that there is no such thing as an OSHA "mandate."  *Id*.  Russi also testified that OSHA does not mandate specific products, and he did not tell Connerton that they would. *Id*. at 897.

Many investors testified that the OSHA mandate was important in making their investment decisions.  Henry testified that the purported OSHA mandate was one of his "big deciding factors" in his decision to invest, and the fact that OSHA would require the use of Connerton's gloves was "extremely" important to him.  Tr. 8/28/18, Doc. No. 186 at 58, 64.  Furthermore, Carlson testified that the OSHA mandate was important to her because she understood that to mean that "sales would be infinite because every medical professional, and even other professions … who use latex gloves would be mandated to use it" which was like "hitting the lottery" for her investment.  *Id.* at 128. Portanova testified that the OSHA mandate was also an important factor in his investment decision because it would make the technology "much more lucrative and much more desirable."  Tr. 8/29/18, Doc. No. 187 at 306.  Furthermore, Herlihy testified that the OSHA mandate was important to his investment decision.  Tr. 9/4/18, Doc. No. 189 at 656.  Holt testified that the OSHA requirement was "very important" to her investment decision.  Tr. 9/11/18, Doc. No. 197 at 1666.

### iii.  Interest from Glove Companies

The government further alleged that as part of his scheme to defraud, Connerton inflated the level of interest in his technology from various glove companies.  Many investors testified that Connerton told them that the glove companies were very interested in his technology.  *See,*

*e.g.,* Tr. 8/28/18, Doc. No. 186 at 79 (Connerton told Henry there was "a lot of interest from multiple [glove] companies"); *id.* at 139 (Connerton continuously told Carlson that glove companies were interested); Ex. 9 (September 2015 email to Maclay stating that the glove companies "all want what I have"); 9/4/18, Doc. No. 189 at 653 (Herlihy testifying that Connerton said the companies were interested); *id.* at 671, 677 (Ward's testimony about same); Tr. 9/11/18, Doc. No. 197 at 1641 (Holt's testimony about same). Connerton told investors that the glove companies were "fighting for" the technology (tr. 8/28/18, Doc. No. 186 at 59 (Henry's testimony)); and were "all after … the gloves" (tr. 9/4/18, doc. no. 189 at 520 (Maclay's testimony)); and that a deal with a glove company was "imminent" (*id.* at 659 (Herlihy's testimony)).

Henry testified that Connerton told him that there were "a bunch of medical glove companies" that Connerton was in talks with, including Cardinal Health, Molnlycke, and Medline, and that Connerton was "on the verge of" selling his technology to one of the companies. Tr. 8/28/18, Doc. No. 186 at 53. Carlson testified that Connerton told her that multiple glove companies had "a very strong interest" in the technology, including Kimberly-Clark, Ansell, Cardinal Health, Molnlycke, and Medline. *Id.* at 115-16, 121-22. Portanova testified that Connerton said he was in "ongoing discussions" with three glove companies who were "quite interested" and he had meetings set up with executives who were "very interested in the product." Tr. 8/29/18, Doc. No. 187 at 291-92.

Specifically, Connerton consistently told Maclay and others that Molnlycke was interested in the technology. Tr. 9/4/18, Doc. No. 189 at 525-26, 541; Ex. 106 (July 23, 2012 email to Maclay); Ex. 110 (December 17, 2012 to Maclay email stating Molnlycke "want[s] our technology!!!"); Ex. 113 (January 2013 to Maclay email that said the OSHA mandate was why

"Molnlycke [was] hot on the trail of our technology"); Tr. 9/4/18, Doc. No. 189 at 678

(Connerton told Ward that Molnlycke had "a great interest" in the technology). Lahey, from

Molnlycke, testified, though, that in 2012 Molnlycke was "interested to learn more" but did not

say that they "wanted" the technology. Tr. 9/10/18, Doc. No. 194 at 1331-32. Connerton met

with representatives from Molnlycke in March 2013. Lahey testified that Molnlycke was not

discussing purchasing the technology at that time. *Id.* at 1335-36. Connerton testified that after

the meeting he "very much" had the impression that Molnlycke was interested in the technology.

Tr. 9/12/18, Doc. No. 199 at 2043. Hofer testified, however, that after the meeting, she gathered

from Connerton that Molnlycke's research and development team was "skeptical" and "not as

impressed with [the technology] as the marketing arm or the organization … side of the business

was." Tr. 8/29/18, Doc. No. 187 at 400, 402. Hofer believed Connerton told her that not

because she was an investor but because she was his girlfriend at the time, and she did not

observe him tell any other investors about Molnlycke's lackluster interest. *Id.* at 401. In June

2013, Molnlycke representatives emailed Connerton and said they were already working on

something similar, "[could] not continue on the proposed route," and "[could] not justify [an]

investment in this route forward without first seeing more substantial proof of concept." Ex.

3216.

Notwithstanding Connerton's knowledge that Molnlycke was not that interested, he

continued to tell investors that they were. He told Manganiello in July 2013 that Molnlycke was

very interested in buying the technology. Tr. 8/29/18, Doc. No. 187 at 251-52. Further,

Connerton emailed Carlson in August 2013 and told her that "Molnlycke has stated that they

continue to want the technology in spite of us refusing their ill[-]conceived offer." Ex. 164.

Overall, Lahey testified that Molnlycke never made an offer to buy Connerton's concept or

technology. Tr. 9/10/18, Doc. No. 194 at 1369. In May 2016, Connerton told Maclay that he decided to pursue a non-exclusive contract with Cardinal Health and Molnlycke. Tr. 9/4/18, Doc. No. 189 at 591; Ex. 3031. Mueller testified that Cardinal was "not interested" in that. Tr. 9/6/18, Doc. No. 192 at 1168. Lahey testified that Molnlycke did not discuss that with Connerton and it would be "highly unusual" for them to do so. Tr. 9/10/18, Doc. No. 194 at 1364.

Connerton also told investors that Kraton, who was developing the material samples, was interested in buying the technology. He told Maclay in 2012 that Kraton had "made a substantial offer to fund the development of [the] technology." Tr. 9/4/18, Doc. No. 189 at 523; Ex. 105. He told Maclay in February 2014 that Kraton was going to buy the technology. Tr. 9/4/18, Doc. No. 189 at 555; Ex. 117 (email to Maclay). He continuously told Carlson in 2014 and 2015 that Kraton was interested. Tr. 8/28/18, Doc. No. 186 at 141, 161; Ex. 5 (April 2015 email to Carlson stating "we are also in the process of negotiating a joint development agreement with Kraton in which we believe that some money will be coming across the table"). Further, Connerton told Herlihy in September 2014 that Kraton called him "weekly many times." Tr. 9/4/18, Doc. No. 189 at 649. In April 2015, Connerton provided in an investor update that Kraton "expressed great interest in exploring a commercial relationship with us" and that they were "waiting with bated breath to see if [the] technology will, in fact, remove the Achilles heel of their synthetic material." Ex. 601; Ex. 602. Pouliot testified that he did not say that. Tr. 9/6/18, Doc. No. 192 at 1204. Overall, Pouliot testified that Kraton "wouldn't buy" the technology and "never discussed purchasing his technology." *Id.* at 1208, 1237.

Further, Connerton told investors that Medline was interested in buying the technology. In 2012, he told investors that he had established "high-level contact" with companies, including

Medline (ex. 151), though Bottcher testified that Medline and Connerton had not been in communication at that point. Tr. 9/6/18, Doc. No. 192 at 1073. Connerton told Manganiello that a deal was "imminent" and "happening any second." Tr. 8/29/18, Doc. No. 187 at 262-63. He told investors that he had a meeting in March 2016 with Medline that went well and that he expected a large deposit from them. Ex. 12 (email to Humphreys that meeting went well and "ended … with talk of a 'deal' which would be a substantial deposit in order for them to 'play' with the material/technology"); Tr. 9/12/18, Doc. No. 198 at 1829 (Humphreys' testimony); Ex. 217 (email to Ward that he anticipated $30 million deposit from Medline); Ex. 218 (email to Ward that a Medline deal would include them sublicensing to other companies). Bottcher testified that there was no talk of a deal, and he never said anything about a substantial deposit. Tr. 9/6/18, Doc. No. 192 at 1084, 1087-89. Further, Bottcher testified that Medline "would never" give $30 million because that was "just unheard of," nor would they sublicense the technology to other glove companies. *Id.* at 1089-90. Further, Bottcher emailed Connerton in April 2016 and told him that they needed more information and data before they could work with him. Ex. 3267. Overall, Bottcher testified that Medline was "not willing to offer anything" on the technology. Tr. 9/6/18, Doc. No. 192 at 1106.

In November 2015, Connerton told Herlihy that Cardinal "want[ed the] technology." Tr. 9/4/18, Doc. No. 189 at 654; Ex. 607. Connerton also told investors in a December 2015 email that Cardinal "want[ed] what we have." Ex. 1016. Mueller testified that in 2015 Cardinal was indeed "interested," but told Connerton that they needed more data which was "imperative to determine any additional commitment on [their] end" and had not told Connerton they were interested in a deal. Tr. 9/6/18, Doc. No. 192 at 1147, 1149, 1158; Ex. 3057. In January 2016 Mueller emailed Connerton that they were not going to proceed and Cardinal "put it to rest" after

that.  Tr. 9/6/18, Doc. No. 192 at 1155; Ex. 3059.  Mueller then stopped answering Connerton's many calls because they were not interested in working with him.  Tr. 9/6/18, Doc. No. 192 at 1156.  Connerton testified, however, that he "never really knew" that discussions with Cardinal "broke down."  Tr. 9/12/18, Doc. No. 199 at 2036.  Notwithstanding, he told investors in June 2016 that Cardinal told Kraton "that internally they are in the process of turning our interaction activities over to their new product development division."  Ex. 137.  Mueller testified that she did not know what he meant and that was "meaningless" to her.  Tr. 9/6/18, Doc. No. 192 at 1169.  Overall, Mueller testified that Connerton engaged in "complete misrepresentation" of his conversations with Cardinal.  *Id.* at 1182.

Many investors testified that the glove companies' interest was important in making their investment decisions.  Tr. 8/28/18, Doc. No. 186 at 78 (Henry); *id.* at 141-42 (Carlson); *id.* at 292 (Portanova).  Specifically, Maclay testified that it was important to her investment decision that Molnlycke wanted the technology because she had heard of Molnlycke and "if that was true, [she] wanted to be a part of it."  Tr. 9/4/18, Doc. No. 189 at 526.  Herlihy testified that it was important to his investment decision that Kraton called Connerton "weekly many times" and wanted to buy the technology because it showed that "interest was at a peak."  *Id.* at 649.  Similarly, Herlihy testified that Cardinal's interest was important because it proved that his investment was "a good one."  *Id.* at 655.  Humphreys testified that it was important to his investment decision that Connerton was in talks with Medline about a deal and a substantial deposit.  Tr. 9/12/18, Doc. No. 198 at 1831.  He testified, though, that even if they were not "close to a deal" he might still have invested.  *Id.* at 1831.

Further, Connerton told investors that the glove companies would participate in an auction of sorts, in which they would each pay $500,000 in order to reserve the right to bid on

owning the glove technology. Tr. 8/28/18, Doc. No. 186 at 78, 80 (Henry's testimony); *id.* at

123 (Carlson's testimony); Tr. 9/4/18, Doc. No. 189 at 521 (Maclay's testimony); *id.* at 654

(Herlihy's testimony). Portanova testified that Connerton told him the companies were

interested and it was just "a matter of who was going to be the highest bidder." Tr. 8/29/18, Doc.

No. 187 at 292. Ward testified that Connerton told her "the interest [from the glove companies]

was so great that he felt the best way to get the most money for the investors would be to have an

auction." 9/4/18, Doc. No. 189 at 677. Holt testified that Connerton told her that Kraton and

Molnlycke would get into a "bidding war" for the technology. Tr. 9/11/18, Doc. No. 197 at

1656.

      Connerton told investors that the glove companies thought the bidding process was

"reasonable." Tr. 9/4/18, Doc. No. 189 at 554-55; Ex. 116 (investor update). Bottcher, from

Medline, testified, however, that the bidding process that Connerton proposed was "absurd" and

Medline would "never do something like that," and would "never" pay $500,000 for a right to

bid. Tr. 9/6/18, Doc. No. 192 at 1076. Mueller, from Cardinal, testified that they did not engage

in bidding processes, and had "never heard of anything" like a $500,000 right to bid, that it was

"not something that a company the size of Cardinal would ever be involved in," and that the

approach was "not at all" reasonable. *Id.* at 1160-61, 1163-64. Lahey, from Molnlycke, testified

that they "did not plan to enter into a bidding process" and "were not receptive to an auction,"

and, further, that they never discussed a $500,000 right to bid fee because that was "not

reasonable." Tr. 9/10/18, Doc. No. 194 at 1359-62.

      Many investors testified that the proposed bidding process, and the companies' purported

support of it, was important in making their investment decisions. Carlson testified that it was

important to her decision to invest that the glove companies were going to pay $500,000 for a

right to bid because that meant that investors would get paid back before the material was even sold. Tr. 8/28/18, Doc. No. 186 at 124. She testified further that she would have wanted to know if the glove companies were not going to pay $500,000 to bid. *Id.* at 124. Maclay testified that it was also important to her investment decision that the glove companies would be paying $500,000 for the right to bid against each other because she thought that would be lucrative. Tr. 9/4/18, Doc. No. 189 at 521. The purported bidding war between the glove companies was also important to Holt because it would drive up the price of the technology. Tr. 9/11/18, Doc. No. 197 at 1656.

Further, investors testified that Connerton told them he had turned down "financial overtures" from various companies who were seeking to purchase the right of first refusal to complete material development and testing. Tr. 8/28/18, Doc. No. 186 at 78-79 (Henry's testimony); *id.* at 122 (Carlson's testimony); Tr. 9/4/18, Doc. No. 189 at 520-21, 633 (Maclay's testimony); Ex. 104 (investor update). Holt testified that in 2014 Connerton said that he turned down a $2 million offer by a glove company because he was expecting $600 million. Tr. 9/11/18, Doc. No. 197 at 1644. However, Bottcher testified that Medline did not make any financial overtures. Tr. 9/6/18, Doc. No. 192 at 1077. Mueller testified that Cardinal did not make any financial overtures. *Id.* at 1161-62. Lahey testified that Molnlycke did not make any financial overtures. Tr. 9/10/18, Doc. No. 194 at 1360. Carlson testified that Connerton turning down monetary overtures was important because "it would increase the value of the technology" and "would get the best price to market." Tr. 8/28/18, Doc. No. 186 at 123.

iv. <u>Investor Money</u>

The government also alleged that as part of his scheme to defraud Connerton made numerous misrepresentations about how investments were used and the financial health of Safety Tech.

Carlson invested $75,000 in Safety Tech and loaned Connerton $12,500. Ex. 16, 22, 29. Carlson testified that Connerton told her that he needed money to "continue to pay the overhead for the operations of the company, as well as compensate consultants and attorneys as necessary." Tr. 8/28/18, Doc. No. 186 at 174. Carlson testified that Connerton told her the $12,500 loan was for a "landing strip" in order to "have money in the bank" so companies didn't think Safety Tech was "desperate when they started making their offers." *Id.* at 164. McCartney, the FBI financial analyst, testified, however, that only 48% of Carlson's initial investment went to testing and attorneys. Tr. 9/5/18, Doc. No. 191 at 1032. Over $50,000 of Carlson's total investment went to Connerton. *See* Ex. 2000 p. 31-32, 43, 74-75.

Manganiello invested $75,000 in Safety Tech. Ex. 21, 24. She testified that Connerton told her that her investment would be used for "research, paying scientists, anything that needed to be done in this kind of deal." Tr. 8/29/18, Doc. No. 187 at 265, 218 (investment would be used for "science and research"). McCartney testified, however, that only 30% of Manganiello's initial $50,000 investment went to testing, consulting, and attorneys' fees. Tr. 9/5/18, Doc. No. 191 at 1047. Over $25,000 of Manganiello's investment went to Connerton. *See* Ex. 2000 p. 39-40, 58-59.

Henry invested $25,000 in Safety Tech. Ex. 1160. He testified that Connerton said he would use his investment for final testing. Tr. 2/28/18, Doc. No. 186 at 59. A large portion of his investment did go to seemingly business-related expenses, but over $5,000 went to Connerton. Ex. 2000 p. 44-45.

Portanova invested $110,000 in Safety Tech. Ex 25. He testified that Connerton told him his investment would be put toward a "landing strip" so that Connerton could "bring [the] product home to market" and for additional research, attorneys, and marketing. Tr. 8/29/18, Doc. No. 187 at 294-95. Connerton told Portanova that his investment was the last portion needed for the "landing strip" but then asked for more money after it was supposed to be fully funded. *Id.* at 324. McCartney testified, however, that only 22% of Portanova's investment went to attorneys, consulting fees, lab work, and research, and 25% of his investment went to Connerton. Tr. 9/5/18, Doc. No. 191 at 1054-55; Ex. 2000 pp. 61-63.

Hofer invested $25,000 in Safety Tech. Ex. 17, 18. McCartney testified that 68% of her investment went to Connerton. Tr. 9/6/18, Doc. No. 193 at 1279; Ex. 2000 at p. 33-34, 63-64.

Maclay invested roughly $400,000 in Safety Tech and loaned Connerton $50,000. Ex. 139. She testified that Connerton told her that Safety Tech was "fully funded" which was important to her that her money would not be going to his $10,000 per month draw. Tr. 9/4/18, Doc. No. 189 at 516-18. The evidence showed, however, that at the time of her first investment, there was only $20 in the Safety Tech account which was "totally inconsistent" with what Connerton said about being fully funded. *Id.* at 537; Ex. 143; Ex. 2000. At the time of her last investment, there was only $2 in the Safety Tech account. Tr. 9/6/18, Doc. No. 193 at 1294; Ex. 2000 at p. 71. Maclay also testified that she was told her investment would go toward additional testing and research and development. Tr. 9/4/18, Doc. No. 189 at 516, 531. A substantial portion of Maclay's investment went to Connerton, roughly $20,000 of which was used to purchase engagement rings at Tiffany's. Tr. 9/6/18, Doc. No. 193 at 1238; Ex. 2000 at pp. 35-37, 71. Maclay testified that it was important to her investment decisions that Safety Tech was fully-funded at the time of her investments because she did not want to pay Connerton's salary

with her investment.  Tr. 9/4/18, Doc. No. 189 at 517-18.  Connerton testified, though, that the money he used to buy rings was money owed to him from his draw.  Tr. 9/13/18, Doc. No. 200 at 2137.

Herlihy invested $13,750 in Safety Tech. Ex. 27.  He testified that Connerton told him he would use his investment for the development of the product.  Tr. 9/4/18, Doc. No. 189 at 658.  McCartney testified that 26% of Herlihy's investment went to testing.  Tr. 9/10/18, Doc. No. 195 at 1463.

Ward invested $12,500 in Safety Tech. Ex. 222. She testified that Connerton told her that her investment was for lab work, research, and legal fees in preparation for a sale.  Tr. 9/4/18, Doc. No. 189 at 707.  At the time of her investment, the Safety Tech account was overdrawn by almost $1,000.  Ex. 2000 at p. 24.  McCartney testified that 68% of Ward's investment went to Connerton.  Tr. 9/10/18, Doc. No. 195 at 1471.

Holt invested $27,500 in Safety Tech.  Ex. 26.  She testified that Connerton said that her investment would go to testing.  Tr. 9/11/18, Doc. No. 197 at 1653.  In January 2015, Holt asked Connerton how much money Safety Tech had, to which Connerton responded there was $70,000.  *Id.* at 1659; Ex. 854.  The evidence showed, though, that at the time of that email, there was only $23,000 in the account, which Holt characterized as "just a flat out lie."  Tr. 9/11/18, Doc. No. 197 at 1661; Ex. 2000 p. 62.

Humphreys invested $75,000 in Safety Tech.  Ex. 30.  He testified that he thought his investment was going to be used for operating expenses.  Tr. 9/12/18, Doc. No. 198 at 1834.  Roughly $50,000 of Humphreys' investment went to Connerton.  Ex. 2000 p. 77-79.

Nicita invested $30,000 in Safety Tech on May 13, 2016.  Ex. 31.  At the time of his investment, there was $199 in the Safety Tech account.  Ex. 2000 at p. 79.  Over $27,000 of

Nicita's investment went to Connerton. *Id.* at 79-80; Tr. 9/10/18, Doc. No. 195 at 1498. Ricca invested $25,000 in Safety Tech on August 20, 2013. Ex. 23; Ex. 2000 at p. 45.

Furthermore, the government alleged that Connerton misstated to his investors the amount of draw he was taking from the company. Carlson testified that Connerton told her he had "never taken all of … what he was entitled to." Tr. 8/28/18, Doc. No. 186 at 131; *see also id.* at 166, 175. Manganiello testified that Connerton told her he only took $80,000 of the $120,000 he was entitled to because he was a "nice guy." *Id.* at 212. Portanova testified that Connerton told him he was not taking his full draw because he did not have the funds to do so. Tr. 8/29/18, Doc. No. 187 at 303-04; Ex. 652. Ward testified that Connerton told her he was being "very frugal" and not taking his full draw. Tr. 9/4/18, Doc. No. 189 at 681. Connerton also testified that he was living a "frugal lifestyle." Tr. 9/13/18, Doc. No. 200 at 2122. Holt testified that Connerton said he was not taking any income and would not take any profit until all of the investors were made whole. Tr. 9/11/18, Doc. No. 197 at 1647, 1654.

Overall, McCartney testified that from June 2009 to May 2016, 84 months, Safety Tech received $1.833 million in investor funds, and she determined that 30% of those investments went to consultants, research, lawyers, testing, and other business expenses, and 55%, over $1 million, went to Connerton, rent, car expenses, and restaurants. Tr. 9/10/18, Doc. No. 195 at 1502-10. McCartney testified, however, that although Connerton took more than $10,000 during some months, over the total 84 months, he took $796,373 which was under the $840,000 draw to which he was entitled during that time period. *Id.* at 1504, 1541, 1547-48. McCartney further testified, though, that 22 of the 84 months there were not enough funds for Connerton to take his draw. *Id.* at 1528.

Carlson testified that Connerton not taking his full draw was important to her because it showed that he was "conservative about expenses." Tr. 8/28/18, Doc. No. 186 at 131. Portanova testified that he would not have invested if he knew Connerton would immediately take money as back pay, which Connerton explicitly said he would not do. Tr. 8/29/18, Doc. No. 187 at 310-11. Furthermore, Holt testified that it was important to her that Connerton was not making any income from Safety Teach because that "made an impression" and "showed commitment." Tr. 9/11/18, Doc. No. 197 at 1648, 1653. Similarly, it was "very important" to Holt that Connerton would not take a profit until the investors were made whole. *Id.* at 1654. Humphreys testified that Connerton taking $50,000 for himself out of Humphreys' $75,000 investment was higher than he would have expected and, had he known Connerton would do that, me would have "evaluated the opportunity to invest differently." Tr. 9/12/18, Doc. No. 198 at 1843.

v. <u>Final Testing Stage</u>

The government alleged further that as part of his scheme to defraud, Connerton told his investors that the cut- and puncture-resistant technology was in its "final testing" stage and would be ready to market shortly thereafter. Many investors testified that Connerton highlighted to them when they were seeking to invest that the technology was almost complete. Connerton admitted to saying that to his investors but testified that he thought "there was a great amount of confusion" about his statements. Tr. 9/12/18, Doc. No. 199 at 2006.

Henry testified that when he was deciding whether to invest in Safety Tech, Connerton told him that he was doing "final testing to – to get [the technology] sold." Tr. 8/28/18, Doc. No. 186 at 53. Connerton told him that "he was on the verge of selling" the technology and was "looking for final investors to do that testing." *Id.* at 53-54. Based on Connerton's assertions,

Henry understood that final testing would occur between August 2013 and February 2014 and he would receive his investment back shortly thereafter. *Id*. at 56, 95.

Carlson testified that Connerton told her he was "very close to bringing it to market," and were probably "three to six months away." *Id*. at 116. Manganiello testified that Connerton told her they were "getting close to the finish line" and it would all be done in six weeks so she should invest more, which she did. *Id*. at 215. Portanova testified that Connerton told him at the time of his 2014 investment that they were five to eight months "from the finish line." Tr. 8/29/18, Doc. No. 187 at 290-91. Maclay testified that Connerton told her in 2012 that final lab work was being completed and then it would be all done in three to six months. Tr. 9/4/18, Doc. No. 189 at 518. He told her in December 2012 that he "received final lab samples today, so now [he] can finalize all the testing." *Id*. at 532; Ex. 111. Herlihy testified that Connerton told him he was in the "final stages of development" and that the product would be finished within a few months. Tr. 9/4/18, Doc. No. 189 at 646-48; Ex. 2. Ward testified that Connerton told her that he was doing final testing and the technology was "right around the corner" and he "just needed a final patent." Tr. 9/4/18, Doc. No. 189 at 671, 676. Holt testified that Connerton told her in spring 2014 that the technology would sell in three to six months. Tr. 9/11/18, Doc. No. 197 at 1641.

There was evidence, though, that the testing and status of the technology was inconsistent with Connerton's assertions to investors. In January 2014, Russi emailed Connerton to warn him that the approval of the material would likely take longer than three to six months. Tr. 9/5/18, Doc. No. 190 at 901-03; Ex. 360. In April 2015, Connerton was saying to investors "we have it!" about the technology (ex. 2), but Russi testified that, as a consultant at that time, he did not regard the technology as "done." Tr. 9/5/18, Doc. No. 190 at 907. Connerton testified that when

he said "we have it!" he meant "from the inception of the testing in 2013 … until the testing concluded in … 2015, every test we had modulus and polyisoprene that did not budge."  Tr. 9/13/18, Doc. No. 200 at 2118.

Further, Simmonds testified that Intertek provided testing on Connerton's material between September 2013 and December 2015.  Tr. 9/5/18, Doc. No. 191 at 952-53.  Testing including tests for puncture, tensile, tear, and cut.  *Id*. at 943.  Generally, the testing was not consistent with Connerton's assertions that the technology was in its final stages at that time.  *Id*. at 959 (material punctured every time); *id.* at 966, 971-72 (in some tests control gloves did twice as well as Safety Tech's material did); *id.* at 976 (November 2014 tests showed Safety Tech material performing worse than control in tear tests); *id.* at 973 (material was too slippery to perform proper cut tests); *id.* at 979 (contrary to Connerton's assertions, Safety Tech material did not have "ten to twenty times higher cut resistance").  Simmonds testified that Connerton did not request other testing that Intertek offered such as needlestick tests, tactility tests, and biological tests.  *Id.* at 957-58, 984, 985-86.

In June 2014, Kraton had a "failed glove test" and Killian Latex was not able to produce a glove with the material Connerton provided.  Tr. 9/6/18, Doc. No. 193 at 1229-30.  Schuck, the Killian representative, testified that in May 2014 he tried to create a glove from Connerton's material and it "shedded" from the mold and "shredded."  Tr. 9/10/18, Doc. No. 194 at 1432. Schuck testified that his attempts to make Connerton's material produced "hard sludge" at the bottom of containers that needed to be "chiseled off."  *Id.* at 1418.  He also testified that it was "incorrect" for Connerton to say in 2014 and 2015 that the material "would be an easy addition to glove manufacturing."  *Id.* at 1421.  Killian's 2015 reports showed that neither the synthetic latex or natural latex with Connerton's additive would pass the tensile properties standards.  *Id.*

at 1428, 1430; Ex. 3114.  Schuck testified that it would be an "inaccurate statement" to say that the synthetic material was "completed or finished or developed" in 2014.  Tr. 9/10/18, Doc. No. 194 at 1432.  Overall, Schuck testified that development was never "completed."  *Id.* at 1438. Connerton testified that he did in fact have completed gloves, over 50 pairs that were created by Diptek, but were confiscated in the search of his apartment and storage unit.  Tr. 9/12/18, Doc. No. 199 at 2078-79, 2083.  Special Agent West testified that there were "three bags containing glove samples" seized from the storage unit, but he believed they were "samples of material," not actual gloves.  Tr. 9/11/18, Doc. No. 197 at 1722; Ex. 5063.

Many of the investors testified that the advanced stage of the technology was important to their investment decisions.  Henry testified that it was important to him when deciding to invest that Connerton told him the technology was in its final testing stages, because Henry was interested in a short-term investment.  Tr. 8/28/18, Doc. No. 186 at 54, 56.  Similarly, Henry testified that Connerton's assertion that his investment would be used for final testing was important to him because "it sounded like it was on the … end of completion."  *Id*. at 59. Carlson testified that it was important to her decision to invest that the technology was nearly completed, because she was interested in a short-term investment.  *Id*. at 121.  Connerton also told her that she only had a short period of time to invest because the technology was so close to market.  *Id*. at 130, 140.  Further, Manganiello testified that she invested because Connerton told her it was "getting close to the finish line" and in six weeks it would all be done, so she should invest more now.  *Id.* at 215.  Manganiello testified that the fact that Connerton said it was going to be a short-term investment, and that she would have her money back in 60 days, was important to her because she took the investment money from her IRA account and she would be penalized if she did not put the money back within 90 days.  Tr. 8/29/18, Doc. No. 187 at 255.

Portanova testified that it was "very important" to his investment decision that the technology was five to eight months from the finish line because Portanova did not want his investment to be long-term. *Id*. at 291. The fact that it was a short timeline and there were final lab samples was also important to Maclay's decision because Connerton told her she would get paid back within three to six months. Tr. 9/4/18, Doc. No. 189 at 525, 533.

      vi. <u>Valuation</u>

The government alleged that, as part of the scheme to defraud, Connerton inflated the valuation of the technology and/or Safety Tech. Henry testified that Connerton told him that the technology would sell "for anywhere between $60 million and $200 to $300 million." Tr. 8/28/18, Doc. No. 186 at 57, 92. Carlson testified that Connerton told her at one point the company was valued at $61 million, and later between $600 and $800 million "based on glove sales alone." *Id*. at 116. Manganiello testified that Connerton said the company was worth $300 million "at least." Tr. 8/28/18, Doc. No. 186 at 213; Tr. 8/29/18, Doc. No. 187 at 262-63. Connerton told Portanova the company was worth $61 million to $500 million. Tr. 8/29/18, Doc. No. 187 at 291. Maclay testified that Connerton said the company was "conservatively" worth $60 million and would be more like $400 million to $600 million. Tr. 9/4/18, Doc. No. 189 at 528-29, 555. Herlihy testified that Connerton said the company was worth $50 million to $500 million. *Id*. at 658. Ward testified that Connerton said the company was valued at $65 million. *Id*. at 680. Holt testified that Connerton told her he was expecting $600 million on a sale. Tr. 9/11/18, Doc. No. 197 at 1641.

Bottcher testified that Medline was "absolutely not" willing to offer $200 million to $600 million for the technology. Tr. 9/6/18, Doc. No. 192 at 1106. Pouliot testified that Kraton never expressed that it would buy the technology for $200 million. *Id*. at 1209. Lahey testified that

Molnlycke did not have a "favorable reception" to a valuation of $60 million. Tr. 9/10/18, Doc. No. 194 at 1361. Manganiello testified that it was important to her in deciding to invest in Safety Tech that the company was valued at $300 million because Connerton told her that every $25,000 invested would give her $2 million. Tr. 8/28/18, Doc. No. 186 at 214.

vii. <u>Patent</u>

The government also alleged that Connerton misled investors about the status of the patent application, which furthered his scheme to defraud. Hanlon, from the USPTO, testified that Connerton first filed an application in July 2008 but some claims were withdrawn and the others were rejected because the examiner "found them not to be patentable" because the claims were "obvious." Tr. 9/11/18, Doc. No. 196 at 1578, 1583-85. In 2012, Connerton received a final rejection on his claims for being too "obvious." *Id*. at 1590; Ex. 1506. Connerton filed a Notice of Appeal in May 2013, but failed to file an appeal brief. Tr. 9/11/18, Doc. No. 196 at 1595-96. Connerton filed a request for continued examination in December 2013, and his claims were rejected again. Tr. 9/11/18, Doc. No. 196 at 1595, 1597-98. He received his second final notice of rejection in July 2014. *Id*. at 1599-1600. He again failed to file an appeal brief. *Id*. at 1601. Connerton filed his second patent application in July 2015, which was again rejected because his claims were too "obvious." *Id*. at 1603, 1608; Ex. 1515.

Notwithstanding Connerton's patent setbacks, many investors testified that Connerton consistently stated that the technology was "patent pending." Tr. 8/28/18, Doc. No. 186 at 125-26 (Carlson's testimony); Ex. 154; Tr. 8/29/18, Doc. No. 187 at 402-03 (Hofer's testimony); Tr. 9/4/18, Doc. No. 189 at 527, 589 (Maclay's testimony); Tr. 9/11/18, Doc. No. 197 at 1657-58 (Holt's testimony). Further, Portanova testified that Connerton told him he had a patent on the technology (tr. 8/29/18, doc. no. 187 at 305) and DiLuna testified that he met Connerton in 2016

and Connerton told him the patent was "all set" (tr. 8/29/18, doc. no. 188 at 455). Many investors testified that Connerton never gave them any bad news about the status of the patent. Tr. 8/28/18, Doc. No. 186 at 132 (Carlson's testimony); Tr. 8/29/18, Doc. No. 187 at 403-04 (Hofer testifying that Connerton told her the patent was denied but that she did not observe him telling any other investors); Tr. 9/4/18, Doc. No. 189 at 589 (Maclay's testimony); Tr. 9/12/18, Doc. No. 198 at 1836 (Humphreys' testimony). Holt testified that Connerton said he was planning to apply for an international patent (tr. 9/11/18, doc. no. 197 at 1657-58) but Hanlon testified that Connerton said he had no intention of filing an international patent (*id*. at 1605).

Many of the investors testified that the status of the patent was important to their investment decisions. Carlson testified that she "would have wanted to know" if Connerton received rejection letters on his patents. Tr. 8/28/18, Doc. No. 186 at 149. Portanova testified that Connerton's assertion that he has secured a patent was important to his investing and he "would not have invested if there was not a patent." Tr. 8/29/18, Doc. No. 187 at 305-06. Furthermore, the status of the patent was "very important" to Maclay's investment decision and if Connerton had told her his patent application had been rejected, she would not have continued to invest. Tr. 9/4/18, Doc. No. 189 at 527-28. Humphreys testified that the state of the patent was important to him and he would have liked to know that Connerton's application was rejected. Tr. 9/12/18, Doc. No. 198 at 1836-37. Overall, Humphreys testified that if he knew at the time of his investment what he knew later about the way Connerton ran his company, he would have changed his investment. *Id*. at 1837.

viii.  Good Faith

Connerton argues that the government failed to prove that he had an intent to defraud because it did not disprove his good faith. The jury heard from Connerton, who testified that he

did not intentionally defraud anyone, that he did not intend to mislead investors, and that he did not make false statements in order to obtain investments. Tr. 9/13/18, Doc. No. 200 at 2141-42. He testified that he was an "eternal optimist" and was his own "best cheerleader." *Id.* at 2183.

The jury was instructed that "[h]owever misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in a good faith belief that the representations were truthful" and that "[a]n honest belief in the truth of the representations made by a defendant constitutes good faith however inaccurate the statements may turn out to be." Final Jury Instr. at 21. The jury was also instructed, however, that if Connerton "participated in the scheme [to defraud] for the purpose of obtaining money or property from another, then no amount of honest belief on the part of Mr. Connerton that somehow he could produce some results to pay people back, will excuse fraudulent actions or false representations by him." *Id.* at 22.

It is the jury's role, not mine, to weigh credibility and determine whether Connerton had the intent to defraud his investors or whether he was acting in good faith. The jury clearly rejected Connerton's arguments that he acted in good faith, and their decision to do so does not entitle Connerton to a judgment of acquittal. The jury was entitled to determine that Connerton engaged in a scheme to defraud his investors, with the intent to defraud them.

### b. Use of Mail or Wires

The government introduced at trial many emails from Connerton to investors and potential investors in which he perpetuated the above-referenced scheme to defraud in order to obtain investments. Accordingly, the jury was entitled to find that Connerton used the wires in furtherance of his scheme to defraud.

In count one, Connerton was convicted of wire fraud related to a February 24, 2014 email to Carlson in which he stated that the patent was "pending" and did not disclose that his patent,

at that point, had been rejected. Ex. 1. In count two, Connerton was convicted of wire fraud related to a September 9, 2014 email to Herlihy in which he stated that Kraton was interested in buying the technology and call him weekly many times. Ex 2. In count three, Connerton was convicted of wire fraud related to a December 30, 2014 email to Holt in which he stated that investments would be used for research and development, legal fees, and necessary expenses and not for salary. Ex. 3. In count four, Connerton was convicted of wire fraud related to a February 20, 2015 wire transfer of $27,500 from Holt. Ex. 4. In count five, Connerton was convicted of wire fraud related to an April 5, 2015 email to Carlson and Ricca in which he stated that the value of the technology was worth millions of dollars. Ex. 5. In count six, Connerton was convicted of wire fraud related to an April 16, 2015 email to Herlihy in which he stated that Herlihy could expect a return on his investment up to 36.4 times. Ex. 6.

In count seven, Connerton was convicted of wire fraud related to an April 21, 2015 email to Ricca in which he stated that he "had" the technology and was at the final stages of the process, which Connerton called the "landing strip." Ex. 7. In count eight, Connerton was convicted of wire fraud related to an August 24, 2015 email to Maclay in which he valued Safety Tech at $12 million and valued the technology at $300 million. Ex. 8. In count nine, Connerton was convicted of wire fraud related to a September 23, 2015 email to Maclay in which he stated that not a single investor would lose a dollar. Ex. 9. In count ten, Connerton was convicted of wire fraud related to a November 23, 2015 email to Humphreys in which Connerton stated that Safety Tech was valued at over $11 million and investors could expect a 10-times return on investment. Ex. 10. In count eleven, Connerton was convicted of wire fraud related to a February 8, 2016 email to Humphreys in which he stated that point of sale was rapidly approaching. Ex. 11. In count twelve, Connerton was convicted of wire fraud related to a March

19, 2016 email to Humphreys in which he stated that the Medline meeting ended with a talk of a deal and a substantial deposit. Ex. 12. In count thirteen, Connerton was convicted of mail fraud related to the February 20, 2015 mailing of a subscription agreement to Holt.

The jury was entitled to weigh the above-referenced evidence and find that the government proved that Connerton engaged in a scheme to defraud his investors. Furthermore, it was the jury's role to weigh the evidence presented at trial, including the testimony and evidence that Connerton argues showed his good faith and lack of fraudulent intent. The jury rejected that argument and it is not my role here to usurp that role. The evidence was sufficient for the jury to reasonably infer that Connerton intended to defraud investors and used the mail and wires to do so. Connerton's motion for judgment of acquittal is **denied** with respect to his counts of conviction for wire fraud, mail fraud, and securities fraud.

### 2. *Illegal Monetary Transactions*

Connerton was convicted of four counts of illegal monetary transaction in violation of 18 U.S.C. § 1957 (counts thirty-three through thirty-six). A person is guilty under this section if he "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and [the criminally derived property] is derived from specified unlawful activity." 18 U.S.C. § 1957(a). As used in subsection (a), the term "monetary transaction" means the "deposit, withdrawal, transfer, or exchange" of funds by, through, or to a financial institution. 18 U.S.C. § 1957(f)(1). The term "'criminally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense[.]" 18 U.S.C. § 1957(f)(2). The government is not required to prove, however, that the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity. 18 U.S.C. § 1957(c).

In count thirty-three, Connerton was convicted of illegal monetary transactions related to a February 14, 2013 check (# 1327) in the amount of $22,902. The government introduced evidence that the money was attributable to Maclay's $75,000 investment from February 8, 2013 which, as discussed above, was derived from wire and securities fraud. *See* Ex. 2000 at p. 36-37. Connerton used the funds to purchase a cashier's check for $19,901 which he used to buy engagement rings for Hofer at Tiffany's. *See id.* at 37.

In count thirty-four, Connerton was convicted of illegal monetary transactions related to a September 29, 2015 withdrawal of $10,221. The government introduced evidence that the money was attributable to Maclay's $25,000 investment from September 26, 2015 which, as discussed above, was derived from wire and securities fraud. *See* Ex. 2000 at p. 71. Connerton used to funds to purchase two cashier's checks, one for $5,221 payable to Jean Erickson, and one for $5,000 payable to himself. *See id.*

In count thirty-five, Connerton was convicted of illegal monetary transactions related to a March 28, 2016 check (# 1039) in the amount of $22,000. The government introduced evidence that the money was attributable to Humphreys' $75,000 investment from March 24, 2016 which, as discussed above, was derived from wire and securities fraud. *See* Ex. 2000 at p. 77. Connerton used the funds to purchase a cashier's check for $21,469.19 which he used to buy engagement rings for Erickson at Tiffany's. *See id.*

In count thirty-six, Connerton was convicted of illegal monetary transactions related to a May 23, 2016 check (# 1056) in the amount of $19,692.71. The government introduced evidence that the money was attributable to Nicita's $30,000 investment from May 13, 2016 which, as discussed above, was derived from wire and securities fraud. *See* Ex. 2000 at p. 79-80. Connerton used the funds to purchase three $5,000 cashier's checks payable to himself.

Viewed in the light most favorable to the government, there was sufficient evidence on which the jury could rely in coming to a reasonable conclusion that Connerton was aware that the money that paid the transactions at issue were criminally derived from the wire and securities frauds that he committed.  On the basis of the evidence summarized above, the jury reasonably could have found that Connerton engaged in illegal monetary transactions with respect to those four financial transactions.

3.  *Tax Evasion*

Lastly, Connerton was convicted of tax evasion in violation of 26 U.S.C. § 7201 (count thirty-nine).  "In order to prevail on a charge of income tax evasion in violation of 26 U.S.C. § 7201, the government must prove (1) the existence of a substantial tax debt, (2) willfulness of the nonpayment, and (3) an affirmative act by the defendant, performed with intent to evade or defeat the calculation or payment of the tax."  *United States v. Josephberg*, 562 F.3d 478, 488 (2d Cir. 2009).  Willfulness, for purposes of tax violations, "may be established by circumstantial evidence."  *United States v. Gilmartin*, 684 F. App'x 8, 11 (2d Cir. 2017) (summary order).

The government introduced documents, charts, and testimony from FBI Special Agent Darling showing that Connerton owed a substantial tax debt for the years 2003-2015 in the amount of $293,033.  Ex. 4122; *see generally* Tr. 9/11/18, Doc. No. 197 at 1752-99.  The government also introduced evidence that the IRS sent Connerton notices regarding that tax deficiency.  Ex. 4120 (chart listing over 80 notices sent to Connerton from 2005 to 2016); Tr. 9/11/18, Doc. No. 197 at 1782.  Furthermore, Darling testified that many of the notices were found during the search of Connerton's home.  Tr. 9/11/18, Doc. No. 197 at 1785.  Accordingly, the jury was entitled to find that Connerton was aware of a substantial tax debt.

The jury was also entitled to find that Connerton willfully evaded his tax responsibility through affirmative acts. Darling testified that Connerton's personal bank account appeared to "intentionally be kept at a minimum, which would make it effectively very difficult for the IRS to forcibly collect on any of that money." Tr. 9/11/18, Doc. No. 197 at 1797. Further, Darling testified that Connerton paid his personal expenses out of his business account, which the IRS could not levy, and used Safety Tech funds to purchase cashier's checks, which the IRS also could not levy. *Id.* at 1777, 1797-99. Darling also testified that Connerton "did not have wages, which would prevent [the IRS] from issuing a wage levy" and the way in which Connerton took his draw made it so there was "no way for the IRS to issue a wage levy against that. Tr. 9/12/18, Doc. No. 198 at 1860, 1871. Darling testified that when Connerton put money into his personal account from Safety Tech, "he would very often pull a good portion of that check out in cash, so there again, not putting a lot of money into the personal account where the IRS may be able to get to it." Tr. 9/11/18, Doc. No. 197 at 1797-98; *see also* Ex. 2000 (summary of Safety Tech account showing Connerton taking out large sums of cash).

Further, Darling testified that cash and lottery tickets were found at Connerton's apartment. Tr. 9/12/18, Doc. No. 198 at 1821-22; *see also* Ex. 4124, 4125. The jury also heard testimony from other witnesses that Connerton carried large sums of cash on him. Tr. 8/29/18, Doc. No. 187 at 244 (Manganiello testifying that Connerton often paid for shopping trips in cash); Tr. 8/29/18, Doc. No. 187 at 245, 249 (Connerton brought $25,000 in cash on vacation and handed out $100 bills); *id.* at 405 (Hofer testifying that Connerton paid in cash when they went out).

Connerton argues that the government improperly included years 2004 and 2005 in the indictment because Safety Tech was not formed until 2006. That argument is unpersuasive for a

number of reasons. First, the jury was not given the indictment, though they were instructed that the government alleged that Connerton had tax deficiencies for years 2004-2015. Second, though, the government did not allege that Connerton evaded his tax liability solely through the use of his business account, and, therefore, the timing of the formation of Safety Tech is irrelevant. Third, even if it was error for the government to include 2004 and 2005, Connerton could not have possibly been prejudiced by that minor inclusion, in the face of overwhelming evidence with respect to his tax evasion for the remaining ten years.

Based on the evidence introduced at trial, a reasonable jury could have concluded that Connerton willfully evaded his tax responsibility. Accordingly, Connerton's motion for judgment of acquittal is **denied** with respect to count thirty-nine.

## III.    Conclusion

For the foregoing reasons, Connerton's Motion for Judgment of Acquittal (doc. no. 180) is **denied**. The clerk is directed to schedule Connerton's sentencing.

So ordered.

Dated at Bridgeport, Connecticut, this 26th day of September 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge